### TOLEDO LIBERAL SHOOTING CO. et al. v. ERIE SHOOTING CLUB.

(Circuit Court of Appeals, Sixth Circuit. December 5, 1898.)

#### No. 567.

NAVIGABLE WATERS—TEST OF NAVIGABILITY.

    In this country, waters, to be navigable in law, must be capable of navigation in fact as highways for the transportation of commerce. A bay or arm of one of the Great Lakes, some 4,000 acres in extent, which was patented to the state as swamp land, and which, though of sufficient depth for navigation where it opens into the lake, is throughout the remainder of its extent of an average depth of not more than 2 feet, and rarely more than 3 feet, and is covered through the summer with grass and rushes, is not navigable water, but merely a marsh, and subject to private ownership.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

The Erie Shooting Club, the complainant below, is a shooting club incorporated under the law of Michigan. The object of the incorporation was to secure, hold, and protect suitable territory for hunting and fishing for the exclusive use of its members. In pursuance of this purpose, it has acquired by lease between three and four thousand acres of land, with the exclusive right to hunt and shoot thereon the wild game and fowl which might frequent said property. The lands thus secured belong in fee to its members, who have leased to the club the exclusive rights mentioned. These lands consist of the shores and submerged lands constituting a shallow, marshy body of water, called "Maumee Bay," a bay or arm of Lake Erie, and lie in Monroe county, Mich. These submerged lands were surveyed and platted and patented to the state of Michigan as swamp or overflowed lands, under the swamp land act of 1850. By grants from the state, and through mesne conveyances, all the lands included within its shores, including two small islands, have become private property. The Toledo Liberal Shooting Company is an incorporation of Ohio, and, like the Erie Shooting Club, is organized for the purpose of holding and protecting lands for the exclusive use of its members as a preserve for wild game, etc. It holds under lease about 106 acres of submerged lands in about the center of Maumee Bay, and entirely surrounded by the submerged lands held under lease by the Erie Shooting Club. With this exception, the Erie Shooting Club holds leases to the entire body of submerged lands within the shores of Maumee Bay, and also holds leases which include the shores of said bay and two small islands therein,—one known as "Indian Island," and containing about 36 acres, and the other known as "Card Island," with an area of about 20 acres. The entire holdings of submerged and dry lands by the said Erie Shooting Club is between three and four thousand acres, much the greater part being submerged lands.

The bill of the Erie Shooting Club represented that the Toledo Liberal Shooting Company, by its officers and members, was trespassing upon its property, by entering same "with boats and otherwise," "and had with guns shot and killed, destroyed, and scared away wild ducks and other wild water fowl thereon, both before and after sunrise, and at other times." This they are charged with as having frequently done, and against the protests and objections of complainant, and that "they threaten to continue so to do," etc. Other averments are also made as to the frequency with which this conduct has been persisted in, and as to the injury done and threatened to be done to the property of complainant. The prayer of the bill was that the defendants be enjoined perpetually from entering upon the said property, and from trespassing thereon, by shooting or otherwise destroying the wild fowl thereon. Certain individuals, being officers and members of the Toledo Club, were joined as defendants, and like relief was sought against them. The Toledo Club and its members made defendants joined in defending, and by answer denied that they collectively or individually had been guilty of trespassing upon complainant's property, by shooting thereon, or by entering upon any dry land owned or rented by complainant. They assert that the submerged lands claimed by complainant are lands under navigable waters, and deny that any exclusive right to navigate said waters has been conferred upon complainant, its members, or the lessors under whom they hold, and assert the right to go on and over said water in any way or direction for the purpose of reaching and hunting upon their own submerged lands. The answer admits that complainant has "the exclusive right to the game or wild fowl found on or over" the lands lawfully held by it under lease or otherwise. Much proof was taken, both as to the character and frequency of the alleged acts of trespass committed by the defendants, and as to the character of the water constituting Maumee Bay. Upon a final hearing, the circuit court granted a perpetual injunction restraining defendants from entering upon the waters covering the submerged lands leased by complainant, in boats or otherwise, save by a prescribed route definitely fixed by the decree, and for the sole purpose of reaching the submerged lands leased by the defendant corporation. The decree also specifically and perpetually enjoined the defendants, their licensees or agents, from "hunting or shooting with guns," or in any manner "killing or taking wild fowl of any kind upon or over the water covering the lands of complainant." From this decree, defendants have appealed.

Willis Baldwin, for appellants.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

This decree must be affirmed. The contention that the waters covering the submerged part of the lands claimed under lease by the Erie Shooting Club are navigable, and therefore subject to the public right of navigation, is not supported by the evidence in this record. The fact that this so-called "bay" was surveyed and platted as swamp land by the government affords a strong presumption against the navigability of the water thereon. This survey was under the authority of the government, which subsequently conveyed the lands so platted to the state of Michigan as swamp lands, under the act of September, 1850, known as the "Swamp Land Act." That the state subsequently conveyed them is a further circumstance tending to establish that no public easement had or could exist therein by reason of the navigability of the waters thereon.

Just where the so-called "bay" opens into the lake, at its southeast end, there is water navigable for ordinary commercial purposes. This channel rapidly shallows as the bay is penetrated. From a line drawn

east and west through the center of sections 34 and 35 to the extreme northern end of this bay, a distance of over three miles, the average depth of water will not exceed two feet. There are places in which it is deeper, but in these it rarely exceeds three feet. There are large sections within the area mentioned, where the water does not average twelve inches; and considerable parts, especially in section 27, where it is not six inches in depth, except under unusual winds or freshets. An effort has been made to show that there are deeper and navigable channels permeating this shallow marsh. Several small creeks empty into this bay. The channels of one or more of these may be traced with difficulty in parts of the marsh. They soon cease to have any defined banks, and are lost in the wider waters, whose level is affected by the fluctuations of the lake. It is impossible upon this evidence to say that any one of these so-called "channels" is navigable. Their continuity is insufficient, and the proof as to their course and depth is altogether too slender and contradictory to justify a reversal of the decree below. From June to October, this body of water is covered with a mass of aquatic vegetation, such as wild rice, rushes, etc. It is then impenetrable, save by the laborious method of punting. At no time is the greater part of this marsh susceptible of supporting "commerce," in any reasonable sense of the term. That the water stands permanently, and that it has a deep opening into Lake Erie, does not establish that this shallow body of water is capable of sustaining commerce, or is burdened with a public use. It is nothing more or less than a marsh opening into the lake. To be navigable in law, it must be navigable in fact; that is, capable of being used by the public as a highway for the transportation of commerce.

None of the characteristics of commercial navigability are shown here. It is the natural feeding ground of the duck and other water fowl. In their pursuit by canoe and flat-bottomed ducking boats the water may be navigated. That is not commerce, and proves nothing. The same test would convert every pond and swamp capable of floating a boat into a navigable stream or lake. This bay is not a highway, never has been, and can never be. At the common law the term "navigable" had a technical meaning, and was applied to all streams or bodies of water in which the tide ebbed and flowed. All such waters were public. That definition is not applicable in this country, and all waters are held navigable in law, and subject to a public use, which are by their character capable of use as highways, for purposes useful to trade or agriculture. It is the capability of being navigated for useful purposes, which is the test. Gould, Waters, § 54, and cases cited; Barney v. Keokuk, 94 U. S. 324; The Daniel Ball, 10 Wall. 557–563; The Montello, 20 Wall. 430–441; Moore v. Sanborne, 2 Mich. 519; Chisolm v. Caines, 67 Fed. 285; City of Grand Rapids v. Powers, 89 Mich. 94, 50 N. W. 661; Hall v. Alford (Mich.) 72 N. W. 137; Rowe v. Bridge Corp., 21 Pick. 344; Attorney General v. Woods, 108 Mass. 436.

In the case of The Montello, cited above, the court said:

"The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or

highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are or may become the mode by which a vast commerce can be conducted; and it would be a mischievous rule that would exclude either in determining the navigability of a river. It is not, however, as Chief Justice Shaw said, 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable; but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture.' "

If this is a private property, it must follow that appellants have no right to trespass thereon. Their own property being inaccessible, save by going over that of appellee, entitles them to a way of necessity. That they obtained by the decree below. Decree affirmed.