STATE *v.* LAKE ST. CLAIR FISHING & SHOOTING CLUB.

1. PUBLIC LANDS—SWAMP-LAND ACT—ISLANDS IN GREAT LAKES—SUBMERGED LANDS.

A strip of unsurveyed land connected with an island in one of the Great Lakes, which land, in its natural state, was in some places a few inches above, and in others slightly below, the ordinary water level, and was at times entirely submerged, did not constitute a part of the bed of the lake, but was swamp and overflowed land, within the meaning of the swamp-land act of 1850, so as to pass to the State thereunder. HOOKER, J., dissenting.

2. SAME—CONSTRUCTION OF ACT.

The swamp-land act of 1850 was a present grant, conveying to the State all lands within the terms of the act, whether surveyed or unsurveyed, but suspending the right of entry until such lands should be identified by the interior department, or, in case of its refusal or neglect to act, by the proper officials of the State.

3. SAME—STATE SURVEY—RIGHT OF ENTRY—EJECTMENT.

Where the Federal authorities refused to make any determination as to certain unsurveyed lands claimed by the State under the grant, and the State thereupon caused a survey to be made, showing the lands to be of the character described in the act, its right of entry, if in fact entitled to the lands, became complete, so as to support an action of ejectment, on the approval of the survey by the State land office, and not before.

4. SAME—ADVERSE POSSESSION.

Possession of such lands could not be adverse to the State prior to the time when its right of entry accrued.

5. SAME—COMPENSATION FOR IMPROVEMENTS.

Nor in ejectment by the State, commenced within six years after such right of entry accrued, could the defendant, who was without color of title, be allowed for his improvements, under 3 Comp. Laws, § 10995,— conceding that such allowance could be made in any case as against the State.

6. SAME—BEDS OF GREAT LAKES—ADVERSE POSSESSION.

An exhaustive discussion of the nature of the State's title to the land beneath the waters of the Great Lakes, and of the question whether any part of such territory can be acquired, as against the State, by adverse possession, will be found in the minority opinion of .HOOKER, J.

Error to St. Clair; Vance, J.    Submitted January 11, 1900.    Decided July 10, 1901.

Ejectment by the State of Michigan against the Lake St. Clair Fishing & Shooting Club and David A. Whitney. From a judgment for plaintiff, defendants bring error. Affirmed.

*Walker & Spalding*, for appellants.

*Horace M. Oren*, Attorney General (*Avery Bros.*, of counsel), for appellee.

HOOKER, J.   The St. Clair river is the outlet of Lake
Huron, and it empties into Lake St. Clair.   At its mouth
lies Harsen's Island, the northerly part of which is hard
land.   This island divides the waters of the river.   A
portion of the water passes to the southwest, along the
easterly side of the island.   This is called the " South
Channel."   The remainder of the water coming down the
river is deflected by the island to the west, along the
southerly side of township 2 N. of range 16 E. of the
United States survey upon the north side of the lake.
After passing the hard land of the island, the banks of the
respective channels are submerged to a great extent, if not
altogether, and are marked by a rank growth of aquatic
plants, which not only border the open water of the chan-
nels, but cover a vast area of submerged land, which,
time out of mind, has been called the " St. Clair Flats."
This region is celebrated as one of the most extensive
breeding places for fish and wild fowl that the country
affords, and has been the paradise of sportsmen since the
first settlement of the region.

In the year 1887 a surveyor named Bartholomew made
a survey and map of the territory between the north and
south channels referred to; or so much thereof as, in his
opinion, should be treated as and called land.   An outline
copy of this map is attached to this opinion, and will aid in
a full understanding of the situation.   It should be stated
that it does not indicate with any accuracy the limits of
submerged land, as the evidence indisputably shows that
the survey was made upon the ice in the winter, and could
have been made at no other season of the year; and the
surveyor attempted to include within the surveyed portion
of this territory all of the submerged lands upon which
aquatic plants could be discerned either upon or through
the ice.   The record shows that the northerly part of Har-
sen's Island was dry land, and five early claims are shown
upon the map.   We understand that these claims ante-
date the American Revolution, but that their confines have
since been established by the Federal Government,

# MAP

~~of the~~

## SAINT CLAIR FLATS

## MICH.

Surveyed in 1887 by H.D.Bartholomew under Authority of a
Commission issued by the Commissioner of the State Land
Office,   Dated Dec 28ᵗʰ 1886.

and permanent mounds erected as landmarks. To the southwest of these claims the land slopes to the water, becoming boggy, and then submerged. The map shows various irregular shapes called "islands;" but we understand that there is no evidence that they are more than submerged land. Perhaps it should be said that there is no evidence upon the subject. They are not involved in this case, further than as they serve to show the extent of the flats, so called. We emphasize the fact that an erroneous impression of the true situation is conveyed by the map if the surveyed portion is to be treated as islands, in the ordinary understanding of the word, or in any sense visible land. We are satisfied from the proof that most of what is called "Harsen's Island" on the map is submerged, and the name would be more appropriately placed upon the lots thereon, instead of upon what is shown by the proof to be mostly submerged ground, unless we are to say that such submerged lands, when the home of aquatic plants, are to be called "islands." This seems to have been the theory of the surveyor, and is one of the claims in this case; it being contended that they are swamp and overflowed lands, within the meaning of the Federal swampland act of 1850.

To the south of the open water called "Muscamoot Bay" upon the map appears a long, narrow strip of territory, platted as land. At its northerly end it would seem to be connected with Harsen's Island; but it is shown by the map to be fully two miles from the nearest point of the old claims, which embrace substantially all of the dry ground upon the island, and nearly all of the four or five square miles lying north and east of this apparent junction with the island is shown to be submerged land. About 1872 some sportsmen erected near the *locus in quo*, which is at or near the south end of this tongue referred to, a clubhouse, and this club and its members have from time to time made additional improvements farther north, contiguous thereto. Other persons have also erected habitations, more or less pretentious, from time to time, until

nearly the entire strip is now occupied by cottages and hotels and clubhouses. The attention of the State land commissioner appears to have been attracted to this state of things, and in 1886, acting without legislative direction or intervention, and upon the assumption that this territory known as "St. Clair Flats" could be treated as swamp lands, within the act of 1850 referred to, he caused the Bartholomew survey to be made. He then sought to induce the commissioner of the land department at Washington to adopt this survey, and convey the territory to the State as swamp land; but this was refused, as a request to cause a survey to be made had been previously refused.

In the year 1895 the legislature passed a joint resolution (No. 17) as follows:

"Joint resolution authorizing the attorney general to commence legal proceedings to quiet the title to certain lands in the township of Clay, St. Clair county, State of Michigan, in which this State has a legal interest.

"*Whereas*, there are certain unsurveyed lands, government survey, lying and being in the township of Clay, in the county of St. Clair, and State of Michigan, known as the unsurveyed lands of Harsen's and Stromness Islands, and other unsurveyed lands adjacent thereto, the title to which is claimed by the United States government and by this State; therefore be it

"*Resolved*, that the attorney general of this State be and is hereby directed to commence suit within four months after the passing of this resolution, in any court of competent jurisdiction, against the United States, or any other parties claiming title therein, to quiet the title to said lands, and to determine the just and equitable rights of all the parties in interest. And the auditor general of this State is hereby directed to draw his warrant upon the treasurer of this State, upon proper vouchers therefor, signed by said attorney general, for the payment of all costs necessitated herein, and the treasurer is hereby directed to pay said warrant out of any money in the treasury not otherwise appropriated.

"This joint resolution is ordered to take immediate effect.

"Approved May 31, 1895."

Thereupon the attorney general began this suit in eject-

ment to oust the defendants from the premises, which are shown to have improvements upon them amounting to about $82,000. Apparently it is a test case, and its determination may practically settle the rights to other improvements along the strip of land described, extending northerly to the old claims on Harsen's Island.

· As in every other case of ejectment, the plaintiff is called upon to prove its title; and, in the absence of a patent from the Federal Government to the State, the claim is made by counsel that the flats, being swamp or overflowed land, passed by the grant of 1850 to the State, and that, never having been identified by the Federal Government, and the commissioner having refused to take any steps for that purpose, by causing a survey or accepting the Bartholomew survey, it was competent for the State to identify the lands, and that, having done so through the Bartholomew survey, it acquired a right of entry under the original grant. *People* v. *Warner*, 116 Mich. 228 (74 N. W. 705), is relied on to support this contention.

The St. Clair Flats are well known as a portion of Lake St. Clair. They are within its meanders, and are separated from the Michigan shore at all points by open water. Unlike flats in tide waters, which are understood to lie between the points reached by the ebb and flow of the tide, these alleged lands, as surveyed and claimed, do not appear to be limited to the territory between the points marked by changes in the level of the Great Lakes, which is said to vary somewhat from year to year, but include land always submerged, some of it several feet deep. We are not cited to an authority which holds that such submerged lands, within the meandered lines of the Great Lakes, and not surveyed by the general government, can be treated as swamp land under this grant, and a number of reasons suggest themselves for a contrary view. We must take judicial notice that the Great Lakes are navigable waters, and while, as in all cases of water, there must be a line where the water meets the shore, and consequently shallows, the legal characteristics of navigable

water attach to all of it.   It is an old and well-settled rule that the privileges of the public are not limited to the channel, or to those parts which are most frequently used, but extend to high-water mark in all tide waters. *Williams* v. *Wilcox*, 8 Adol. & E. 314; *Com.* v. *Church*, 1 Pa. St. 105 (44 Am. Dec. 112); *Porter* v. *Allen*, 8 Ind. 1 (65 Am. Dec. 750); *Mayor, etc., of Mobile* v. *Eslava*, 16 Pet. 234; *Simpson* v. *Seavey*, 8 Me. 138 (22 Am. Dec. 228); *State* v. *Babcock*, 30 N. J. Law, 29; *State* v. *Board of Harbor-Line Com'rs*, 4 Wash. 6 (29 Pac. 938); *Tennessee, etc., R. Co.* v. *Danforth*, 112 Ala. 80 (20 South. 502).   In *People* v. *Featherly*, 12 N. Y. Supp. 389, it was held that Sodus Bay was a part of Lake Ontario, with respect to game laws.   And we have held in the case of *People* v. *Warner*, *supra*, that the title that Michigan took when it was admitted to the Union, in 1836, is not limited to water sufficiently deep to float craft, but extends to the point where it joins the ground of the riparian owner, "whether the water be deep or shallow, and although it be grown up to aquatic plants and unfit for navigation." The right of boating for pleasure, as well as profit, and that of fishing and fowling, extend to all parts of navigable water, and are not confined to open water, not adapted to such purposes, to the exclusion of the sedges, shallows, and weedy places, which are the natural haunts and breeding places of game and fish.   In *Freytag* v. *Powell*, 1 Whart. 536, it was held that lands on navigable rivers, between high and low water marks, are not within the jurisdiction of the land office of the State, so as to be the subject of grant by warrant, survey, and patent.   See, also, *Com.* v. *Fisher*, 1 Pen. & W. 467.   In the case of *Lincoln* v. *Davis*, 53 Mich. 391 (19 N. W. 103), the late Mr. Justice CAMPBELL took the trouble to write a concurring opinion to place this question beyond dispute.   He said:

"Outside of the statutory line, I think there can be no doubt of the right of any one to fish with such appliances as are appropriate to open-water fishing.   *   *   *   Fish

are like any other animals *feræ naturæ*, and in this region have always been regarded as open to capture by those who have a right to be where they are captured."

Again, the understanding of the Federal authorities that these flats were within and a part of the lake appears from the method of survey and sale of abutting lands. It was the uniform practice of its surveyors to run meander lines in proximity to navigable waters, not for the purpose of fixing the limits of its subdivisions, but for the double purpose of defining the water-course, and estimating the amount of land in the several subdivisions bordering upon the water. This has been repeatedly held by the Federal courts, and this court has followed the rule. *Pere Marquette Boom Co.* v. *Adams*, 44 Mich. 403 ( 6 N. W. 857 ). It never claimed or attempted to sell the land between such meander lines and the shore line, and it is the settled law of this State that the purchaser of the abutting land takes title to the shore line, regardless of the meander line. This was all inconsistent with the idea that the Federal government had lands outside of the meander lines, and excludes the contention that it retained land beyond the shore line, which it might survey and sell at pleasure up to 1850. It may be said that the case of *Toledo Liberal Shooting Co.* v. *Erie Shooting Club*, 33 C. C. A. 233, 90 Fed. 680, is at variance with this claim. It must be admitted that there is language used in that case which, if given a general application, would seem to limit the attributes of navigable water to those portions of the Great Lakes which are susceptible of supporting commerce, and, while admitting that the waters in that case were navigable for sport or for fishing and hunting, brushed such navigability aside by the remark that "such was not commerce, and proved nothing." We think this at variance with the general rule that, once a body of water is navigable, its character as navigable water extends to low-water mark. It certainly does as to rights of fishing, boating, hunting, and in cutting ice by any member of the public, if the State owns title to the bed. But in that case the Federal Gov-

ernment had surveyed this land, and had conveyed it to the State by patent, and the State had in turn conveyed it. The action of the United States government defined the boundaries of the lake by its meander lines, and determined the territory in question to be land, and not within the boundaries of the lake. The Federal land office confirmed this survey, and conveyed the premises to the State as swamp land, under the grant of 1850, and the State sold it to private persons. This we understand to put the question of the character of the land and ownership beyond contradiction. See *Brown* v. *Parker, ante,* 390 (86 N. W. 989).

The case of *Sterling* v. *Jackson,* 69 Mich. 491 (37 N. W. 845, 13 Am. St. Rep. 405), was another case where the land was held under a patent, and, according to the majority opinion, lay inside of the original meanders and of the original shore line. It was treated as swamp land, but subsequently an inlet was made by the action of the water. It was held that the title of the proprietor was not affected by this change in the condition of the shore. Two of the judges dissented upon the question of fact, holding that it was a disputed question where the original shore line was, and therefore for the jury. The opinion of Mr. Justice CAMPBELL supports many of the views expressed in the present case, and, as they are not opposed to the majority opinion, they are entitled to weight; *e. g.,* he says:

"The fen countries of England are famous; and the only way to reach water fowl is by the use of boats. Our attention has not been called to any case where it has been held actionable to shoot or angle from a boat in any class of public streams."

Again, in the opinion of Mr. Justice MORSE it is well said:

"I cannot give my judicial sanction to the practical selling out of the public waters, the navigable streams of this State, for purposes of fishing and fowling, to a favored few, to be stocked and replenished year by year

at the expense of the public, and the shutting out of the great mass of the people, who bear the burden of such expense, from a right and enjoyment as dear to some of them, at least, as it can be to any riparian owner along such streams, or any member of a club or syndicate who have leased such owner's premises."

And also:

" In my opinion, in the solution of this case, it makes no difference whether the plaintiff owns the soil under the waters of this bay by virtue of the grant in his patent, or as a riparian owner of the shore. It must be conceded, from the testimony, that for at least 30 years it has been navigable water, while, by the showing of some of the defendant's witnesses, it has been such for 45 years. It is well-settled law, with no respectable authority disputing it, that even where a person owns the soil by grant, and the waters of the sea or a navigable lake encroach upon it, and it thereby becomes covered with navigable water, and a part of the sea or lake, until such waters recede, or the land is otherwise reclaimed, and so long as it continues navigable, the public right to use it for purposes of navigation prevails. As long as it remains as it is, the people —the common public—have a right to navigate it. They can cross over it, and pass up and down it, and the plaintiff is powerless to stop them. This is virtually conceded by his counsel. And, if the people have this right to pass over it, they have the right to take fish in its waters by hook and line, or in any other way common to all under our laws. They have the right to kill or capture ducks or other wild fowl resting or feeding upon its waters, or flying over it. They have the right to call such ducks or other wild fowl by all the devices known to sportsmen, and not prohibited by the general game laws, and in the seasons not inhibited by such statutes, from the air, land, or lake, upon or over the waters of this bay, as long as it shall remain such. If the plaintiff owns the soil by grant, he has a right, no doubt, to reclaim it by dikes or levees, but until he does so the public have the right to use it, as long as its waters are navigable. It is a mistake to suppose that there has ever been a decision or ruling of this court to support, directly or by analogy, the contention of the plaintiff that the riparian owners of the shores of navigable waters have an exclusive right to take the fish therein, or kill the wild fowl resting or feeding thereon, or flying over the same."

But this case of *Sterling* v. *Jackson* is not like the present. The majority opinion was based upon the theory that, where the lake broke through a natural barrier and flooded private lands, the title to such lands was unchanged. Again, it is said that submerged land cannot be conveyed by the State without legislation. 69 Mich. 493 (37 N. W. 849, 13 Am. St. Rep. 409).

The claim appears never to have been made that the State did not take title to the meandered or actual shore line when it was admitted to the Union, and such claim would have aroused opposition on the part of the State had it been made. Again, similar flats are found in many places along the shores of our Great Lakes; *e. g.*, in the neighborhood of Monroe and Trenton, on Lake Erie, and in Saginaw and Green Bay. If the St. Clair Flats may be treated as swamp lands, so must these; yet it would be inconsistent with the riparian rights of abutting proprietors, who, under the well-settled law of this State and most others, have rights of access to deep water in front of their premises, and of this they can only be deprived under the right of eminent domain. Not only has the Federal Government never made such a claim, but there has never been an inducement for the State to do so, as the title to all such land passed to the State, as a part of the bed of the lake, and as such had belonged to Michigan 14 years when the swamp-land act was passed. This being so, neither party could have supposed the swamp-land act to apply to submerged lands in the Great Lakes. The government had no title to convey.

Under the cases of *People* v. *Silberwood*, 110 Mich. 103 (67 N. W. 1087, 32 L. R. A. 694), and *People* v. *Warner, supra*, it must be taken as settled law that all land submerged, when the water in the lakes stands at low-water mark, is a part of the lake, and the title in the State, and all land between low-water mark and the meander line belongs to the abutting proprietor, holding under an ordinary patent from the Federal Government or State. It may be claimed that the *Warner Case* fur-

nishes encouragement for this claim made here; but, on the contrary, the court was careful to limit rights under the swamp-land act to such swamp lands as should constitute, in whole or in part, islands, and, by the language quoted, expressly held that the State acquired title, by its admission, to the shallow as well as the deep water of the lake. See, also, *Webber* v. *Boom Co.*, 62 Mich. 626 ( 30 N. W. 469 ).   In this connection we may allude to the claim of defendants' counsel that a correct conclusion was not reached in that case upon the question of the right of the State to identify unsurveyed swamp lands.[1]   We considered the question a close one, and attempted to decide it in conformity to what we considered well-indicated views of the Federal Supreme Court.   It goes without saying that if we were mistaken in our inferences, and that court has reached or shall hereafter reach a contrary conclusion, it will be necessary to modify our views upon the subject; but, as the question is eliminated from this case by what has been said, we do not discuss the subject further.

While the State has failed to establish a title under the swamp-land act, it does not follow that it has no title to the *locus in quo*.   If it was a part of the bed of the lake at the time defendant began to improve it, it belonged to the State; and, if it could be said to be an island at that time, such island might belong to the State.   Whether it did or not would depend upon its character in 1836, when the State was admitted.   See *People* v. *Warner, supra.* The undisputed proof shows that the only semblance to land at the point in question was a small sand bar, which was submerged, except in times of low water and whenever the water was roughened by wind.   The finding of the learned circuit judge who tried the case accords with this, and, though he reaches the conclusion that it was a part of Harsen's Island, it is apparently based on the

[1] Counsel cited, in support of their contention: *McCormick* v. *Hayes,* 159 U. S. 343 ( 16 Sup. Ct. 37 ); *Locomotive Works* v. *Emigrant Co.,* 164 U. S. 559 ( 17 Sup. Ct. 188 ); *Lumber Co.* v. *Rust,* 168 U. S. 589 ( 18 Sup. Ct. 208 ); *Brown* v. *Hitchcock,* 173 U. S. 473 ( 19 Sup. Ct. 485 ).

theory that this was all swamp land. This sand bar was neither an island nor a part of an island, but a part of the bed of the lake, and as such belonged to the State, *prima facie;* but, even if it could be called an island, it was an island only to low-water mark, and the grassy lake around it did not make it State swamp land. In the case of *Watson* v. *Peters,* 26 Mich. 508, a question arose whether riparian rights in Saginaw river extended beyond a sand bar and middle ground; and although there was evidence that the sand bar was never entirely submerged, except during heavy north winds and during spring freshets, the court said that "it did not appear to have been an island, but, rather, a sand bar, or place of shallow water, exposed only when the wind was favorable or the water low," and that riparian rights of the abutting proprietor extended beyond it. See, also, *Webber* v. *Boom Co., supra.* In this case the bar was not above water, as a rule, and was visible only under most favorable conditions. The building was set upon piles driven by a pile driver which was set in the water, and the building extended beyond, and more than covered, the portion of the small sand bar that occasionally appeared above the water.

We have yet to consider the defendants' claim of title by adverse possession. At the common law, title to land could not be acquired against the government by adverse possession, and such is the rule as to the Federal Government, against whom an intruder cannot acquire title by occupancy. This would seem a reasonable rule, for there seems no good reason why the public should be robbed of its domain by trespassers, or put to the expense of patrolling it to prevent. See 1 Am. & Eng. Enc. Law (2d Ed.), pp. 877, 878. It has, however, been the somewhat doubtful policy of this State to permit title to State lands to be thus devested, and the valuable timber upon State lands has been a temptation to set up such claims. Again, it is not uncommon for communities to be put to litigation and expense to condemn land for highways which has already been acquired for the purpose, and subsequently lost

through the unheeded encroachments of abutting land-owners.   It is now, asserted that this rule extends to sub-merged lands in navigable water.

.It has been the policy of this State to preserve the public rights of navigation, fishing, etc., in navigable waters, for the use of the public.   The right was guarded by Virginia in the cession of the territory now comprising Michigan. It has been often decided that the title taken by the Federal Government under such cession was limited by the provisions of its grant, and that the States subsequently carved from the Northwest Territory took the title to the submerged land under the cession and the Ordinance of 1787, and that the Federal Government could not withhold from the State the title to the submerged land, as it could and did the title to the other land of the territory.   The States did not take an unqualified title to these lands. They were taken by them in trust for a public use for the people of the States, and subject to the rights of naviga-tion by the people of the entire country, and regulation by Congress.   By this ordinance it was provided that the navigable waters leading to the Mississippi and St. Law-rence, etc., "shall be common highways, and forever free, as well as to the inhabitants of the said territory as to the citizens of the United States, and those of any other States that may be admitted into the confederacy."   See *Shively* -v. *Bowlby,* 152 U. S. 33 ( 14 Sup. Ct. 548).   In the case of *People* v. *Kirk,* 162 Ill. 138, 146 ( 45 N. E. 830, 53 Am. St. Rep. 277 ), Mr. Justice Craig said:

"The law seems to be well settled in the different States that the title to and dominion over lands covered by tide waters within the boundaries of the several States belong to each State wherein they are located.   The State holds the fee in trust for the public.   The doctrine estab-lished in regard to lands covered by tide waters has also been held applicable to lands bounded by fresh water on our large lakes.   *   *   *   The rights of navigation and of fishery remain substantially in the public as before.   If these rights were taken away or materially infringed upon by the act, or the action of the commissioners under the

act, the action of the commissioners could not be sustained, as the legislature has no power to dispose of the waters of Lake Michigan, or the lands under the waters, contrary to the trust under which they are held for the people."

In *Illinois Central R. Co.* v. *City of Chicago*, 173 Ill. 485 (50 N. E. 1104), the same distinguished jurist said:

"It is true that the State holds the title to the lands covered by the waters of Lake Michigan, lying within its boundaries; but it holds the title in trust for the people, for the purposes of navigation and fishery. The State has no power to barter and sell the lands as the United States sells its public lands, but the State holds the title in trust, in its sovereign capacity, for the people of the entire State, as held in *People* v. *Kirk*, 162 Ill. 138 (45 N. E. 830, 53 Am. St. Rep. 277)."

In *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387 (13 Sup. Ct. 110), it was said:

"The interest of the people in the navigation of the waters, and in commerce over them, may be improved, in many instances, by the erection of wharves, docks, and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has

an interest, cannot be relinquished by a transfer of the property.   The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. * * * A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power, and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation.   The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace."

See, also, the recent case of *Illinois Central R. Co.* v. *City of Chicago*, 176 U. S. 646 (20 Sup. Ct. 509), where Mr. Justice Brown said:

"Under the law of the State of Illinois, as laid down by the supreme court, not only in the case under consideration, but in the prior case of *People* v. *Kirk*, 162 Ill. 138, 146 (45 N. E. 830, 53 Am. St. Rep. 277), 'the State holds the title to the lands covered by the waters of Lake Michigan, lying within its boundaries; but it holds the title in trust for the people, for the purposes of navigation and fishery.   The State has no power to barter and sell the lands as the United States sells its public lands, but the State holds the title in trust, in its sovereign capacity, for the people of the entire State.'   Such was also the ruling of this court in a case between the same parties.   *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387 (13 Sup. Ct. 110), affirming *Illinois* v. *Illinois Central R. Co.*, 33 Fed. 730.   This, too, is a question of local law, with regard to which the decisions of the State courts are conclusive."

In *Priewe* v. *Improvement Co.*, 93 Wis. 550 (67 N. W. 918, 33 L. R. A. 645), it is said:

" ' It is plain that no grant by the State, for purely private purposes, of such lands, could operate to impair or defeat the previously-acquired rights of the riparian owner; for the State has no right to make such a grant. The right which the State holds in these lands is in virtue of its sovereignty, and in trust for the public purposes of navigation and fishing. The State has no proprietary interest in them, and cannot abdicate its trust in relation to them; and, while it may make a grant of them for public purposes, it may not make an irrepealable one, and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. These views are maintained with clearness and vigor in the very able and elaborate opinion of the court in the case' last cited.[1] *McLennan* v. *Prentice*, 85 Wis. 444 ( 55 N. W. 764 ).

" Certainly, if the State had power, by the act in question, to convey and relinquish to ' James Reynolds, his heirs and assigns, forever,' and hence to the defendant,— a private corporation,—all its right, title, and interest in and to all lands lying within the limits of Muskego Lake, then it may, in a similar manner, convey and relinquish to private persons or corporations all such right, title, and interest in and to every one of the 1,240 lakes in Wisconsin. Such conveyance and relinquishment is claimed to be a legitimate exercise of the police power of the State; and it is contended that, because the act asserts that such system of drainage is required for the preservation of the public health, the same is conclusive upon all courts. While the question of the necessity, expediency, or propriety of taking private property for public use is for the legislative department of the government, yet the question whether a particular use is public or private is for the judicial department. *Wisconsin Water Co.* v. *Winans*, 85 Wis. 39, 40 ( 54 N. W. 1003, 20 L. R. A. 662, 39 Am. St. Rep. 813 ), and authorities there cited."

See, also, *Illinois Steel Co.* v. *Bilot*, 109 Wis. 418 ( 84 N. W. 855, 85 N. W. 402 ).

In *Shively* v. *Bowlby*, 152 U. S. 43 ( 14 Sup. Ct. 548 ), it was said of the title to beds and shores of navigable waters :

" It properly belongs to the States, by their inherent sovereignty, and the United States has wisely abstained from extending, if it could extend, its survey and grants beyond the limits of high water."

---

[1] *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387 ( 13 Sup. Ct. 110 ).

The extent to which the legislature may control and dispose of the bed of the lakes is a question about which the courts are not in harmony. As has been seen from the cases discussed, some of them hold that there is a limitation on the power of the State to cut off the rights of navigation or fishing by its inhabitants. Others say that they cannot grant the fee of the submerged land, and that whatever privileges are given are more in the nature of licenses, and are always revocable. It is not necessary to decide this question. It is safe to say, however, that all agree that there is a trust reposed in the State, which takes the title to submerged land for public uses, and not for purposes of profit by sale; and whether we hold that the legislative management must be conclusively assumed to be for the best interests of the public, or is open to question in the courts, the fact remains that the land is taken in trust for public uses, and we may properly conclude that, in passing a statute of limitations applicable to dry land, the legislature had no intention of subjecting the public fisheries and navigable waters to the right of private and exclusive title to be acquired by occupancy. The vast and comparatively inaccessible territory comprising the St. Clair Flats and other similar tracts offer great opportunities and inducements to sportsmen and others to assert exclusive rights; and it is unreasonable to suppose that while the settled policy of the State was to protect the public rights in submerged land, and grant no one exclusive rights therein, the legislature should take so inconsistent a step as to make it easy to exclude the public, through a statute authorizing the acquirement of title by adverse possession. To apply this rule to submerged lands would make it difficult and expensive to protect the game preserves, and a premium would be placed on perjury, with a view to proving exclusive occupancy of portions of the public fisheries and game preserves. Everybody's business of protecting against such encroachment would be likely to be neglected by everybody, and soon the State might own no land in these remote and isolated regions,

and the public rights of fishing, fowling, boating, etc., be devested and in the possession of the favored few.

In *McLennan* v. *Prentice*, 85 Wis. 428 (55 N. W. 764), it was held that:

"Lands lying under the shoal waters of the Great Lakes, and between the bank and navigable water, are held by the State in trust for the public purposes of navigation and fishing, and no grant thereof for purely private purposes can operate to impair or defeat the previously-acquired rights of the riparian owner."

It was further said:

"The State has no proprietary interest in them, and cannot abdicate its trust in relation to them; and, while it may make a grant of them *for public purposes*, it may not make an irrepealable one, and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. These views are maintained with clearness and vigor in the very able and elaborate opinion of the court in the case of *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387 (13 Sup. Ct. 110), and are supported and illustrated by numerous adjudicated cases."

In *Lamprey* v. *State*, 52 Minn. 181 (53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541), the court said:

"The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, * * * are self-evident, and have been frequently animadverted on by the courts. * * * If the rule contended for by the appellants is to prevail, it would simply open the door for prowling speculators to step in and acquire title from the State to any relictions produced in the course of time by the recession of the water, and thus deprive the owner of the original shore estate of all riparian rights, including that of access to the water. The endless litigation over the location of the original water lines, and the grievous practical injustice to the owner of the original riparian estate, that would follow, would, of themselves, be a sufficient reason for refusing to adopt any such doctrine."

If this language is appropriate to a claim that the State may own and sell land within any accretions or relictions,

how much more pertinent is it to the claim that the State may cut off all public and riparian rights by surveying and selling the submerged lands off shore, or that the legislature intended to permit the same result to be attained through a statute of limitations!

It is a rule of construction that statutes providing for the granting of land will require an express provision to authorize a grant beyond the shore line. See Gould, Waters, § 36. In the case of *Mann* v. *Land Co.*, 44 Fed. 27, Congress had passed a law for the relief of one Valentine, providing for the issue to him of certain scrip, which he was at liberty to use in payment for lands which he was authorized to locate upon any unsurveyed lands belonging to the United States in the then territory. He attempted to locate them on tide lands; and, although tide lands differ from submerged lands, the court held that the statute should not be construed to include them. See, also, *Webber* v. *Boom Co.*, 62 Mich. 626 (30 N. W. 469). The statute of limitations mentions only lands. No reference is made to waters. If we are to apply the statutory rule that in construing statutes the language shall be taken in its ordinary sense, we should not apply it to any but land generally treated as marketable by the State. Such a construction as is asked by defendants was discussed in the case of *Weber* v. *Board of Harbor Com'rs*, 18 Wall. 68. The court said:

"In answer to this pretension, it is contended *with much force* that the statute only applies to lands which the State holds as private proprietor, for sale or other disposition, and in respect to which the title may be lost by adverse possession, as defined in the same statute, *and not to lands which she holds as sovereign, in trust for the public.* * * * Where lands are held by the State simply for sale or other disposition, and not as sovereign, in trust for the public, there is some reason in requiring the assertion of her rights within a limited period, when any portion of such lands is intruded upon or occupied without her permission; and the policy of the statute would be carried out by restricting its application to such cases."

This general language comes from a high source, and is as forcible in its relation to Michigan as to California.

In the opinion of the writer, there is little enough excuse for allowing the public domain to be pilfered from the public through statutes of limitation; but to unnecessarily extend the practice by applying the statute to navigable water, in the face of the palpable truth that such application could not and should not, for many reasons of public policy, have been contemplated by the legislature, would be a serious blow to public interests of navigation and fishing and to riparian rights. We think it unreasonable to suppose that the legislature intended to allow title to be acquired to the bed of the Great Lakes, when it has never permitted its sale, but, on the contrary, has always manifested an intention to discharge the trust by preserving it for public uses; and we should therefore hold that title to submerged lands in the Great Lakes, held by the State, cannot be devested by adverse possession. The late case of *Illinois Steel Co.* v. *Bilot*, 109 Wis. 418 (84 N. W. 855, 85 N. W. 402), supports this view.

Our views differ from those of the circuit judge in several respects, but, under the undisputed proofs, we think that the defendants unlawfully withhold these premises from the State, and the court reached the right result.

It is contended that the defendant is entitled to pay for its improvements, under 3 Comp. Laws, §§ 10995, 10996; but we think they have no application to this class of lands. Every one must be presumed to know the law, and if these are not lands that private persons can acquire the right to exclusive occupation of, except by the license of the State, and for purposes benefiting the general public, there is no reason for thinking that they were designed to apply to such a case as this. See *Jones* v. *Merrill*, 113 Mich. 433 (71 N. W. 838, 67 Am. St. Rep. 475).

To briefly recapitulate: St. Clair Flats are a part of the bed of one of the Great Lakes. The Federal Government had only a title in trust for future States, with cer-

tain powers in relation to navigation.   On the admission of Michigan, all of said submerged land covered by this lake, to low-water mark, passed to the State in its sovereign right,—not as private proprietor, and subject to sale, but in trust for the public, according to the original cession from Virginia and the Ordinance of 1787.   The Federal Government having lost its title in 1836, these lands could form no part of the grant of 1850.   The Bartholomew survey was perhaps within the power of the land commissioner to ascertain and locate lands belonging to Michigan or its people within its bounds, but the land commissioner had no right, in the absence of legislative authority, to survey merely submerged land, or to sell or convey the same, or to cause it to be represented as land instead of lake.   The statute of limitations has no application to the submerged lands belonging to the State, whose duty it is to hold them for the benefit of the public in the enjoyment of the ancient rights of navigation, fowling, and fishing. The power of the legislature to authorize the erection of wharves and other structures, and the rules applicable thereto, are not passed upon in this case, as the facts do not call for it.

In this view of the law, we have no alternative but to affirm the judgment of the circuit court, and it is so ordered.

MONTGOMERY, C. J.   The controlling question in this case is whether lands of the character of those involved in this case are swamp lands or overflowed lands, within the meaning of the swamp-land act of 1850.   The circuit judge found the facts as follows:

" The land, in its natural state, at the northern part of Harsen's Island, is but a few feet above the surrounding waters, and, proceeding towards the south, gradually becomes lower, and at about the southerly lines of the private claims all timber growth ceases, and from that point southerly it is a low, boggy prairie, upon which marsh grass, rushes, lilies, cat-tails, and other subaquatic plants, alone, are found growing; and the entire stretch of land

southerly from these claims between the south and middle channels, including the land involved in this suit, is, and was in 1850, so low and wet as to be unfit for cultivation until reclaimed by dikes and drains.

"Extending from near the central portion of fractional section 36 of township 2 north, range 15 east, as shown by the plat of the Bartholomew survey, annexed hereto, there extends in a general southwesterly direction a belt or strip of land, by some witnesses called a 'reef,' which constitutes the westerly boundary of the south channel, which is the main ship channel of the St. Clair river. The land named in plaintiff's declaration, and occupied by the defendants, is the extreme southerly point of this belt or strip of land. Between this narrow belt of land and a similar belt constituting the easterly shore of the middle channel, and extending thence northerly for about two and a half miles, is a body of shallow water known as 'Muscamoot Bay,' varying in depth from a few inches to five or six feet in some places, and the depth thereof is not published in the public charts of Lake St. Clair published by the Federal Government as guides to navigators.

"This strip, belt, or reef constituting the westerly shore of the south channel, between the point of its commencement, at section 36, above named, and the premises sought to be recovered in this suit, is, and was in 1850, broken in three or four places by channels ranging from a few feet to several rods in width, and from a couple of feet in depth to four or five feet in one or two instances. A portion of the waters flowing down the south channel flows through these narrow channels, last named above, into Muscamoot Bay. This narrow belt of land gradually becomes lower as it proceeds southerly, and, towards the southerly end, portions of it in 1850 were a few inches under, and others a few inches above, the water at its ordinary stage; but at all times it was plainly a continuation of Harsen's Island, and, at the point where the premises in suit are located, was in 1850, at the time of the passage of the swamp-land act, but a few inches above water at its ordinary stage, while in times of high water, caused by winds or flood, the greater portion was wholly covered thereby. Numerous clubhouses and cottages have, during recent years, been erected on this belt of land, and are occupied during the summer season. The location of the more important thereof is shown on Comstock's Chart of Lake St. Clair, a copy of which is annexed.

"The defendants' counsel contend that the premises in suit in 1850 were not swamp and overflowed, within the meaning of the swamp-land act, but, on the contrary, were a portion of the bed of Lake St. Clair. I cannot agree with this contention, and find the fact to be that this land, together with all that part of Harsen's Island lying southerly of the five lots surveyed by the Federal Government, heretofore referred to, is now, and was at the time of the passage of the swamp-land act, in 1850, swamp and overflowed lands, within the meaning of that act."

If the evidence sustains this finding, I think the conclusion of law is correct. These lands certainly were not the bed of the lake, in the ordinary sense of the term. *Toledo Liberal Shooting Co.* v. *Erie Shooting Club*, 33 C. C. A. 233, 90 Fed. 680; *Niles* v. *Cedar Point Club*, 175 U. S. 300 (20 Sup. Ct. 124). An examination of the record satisfies me that the finding is supported by the evidence.

The two questions whether the State has sufficient title to maintain ejectment under the swamp-land act, and as to whether title accrued within a period of 20 years, are both ruled in the affirmative by *People* v. *Warner*, 116 Mich. 228 (74 N. W. 705).

The defendant is not entitled to compensation for improvements, as the right of entry did not accrue until the approval of the Bartholomew survey, December 31, 1890, and the action was brought in September, 1895,— less than six years after the right accrued. We do not determine whether the statute giving a right of compensation for improvements in certain cases applies to actions brought by the State, as the decision of that question is not necessary in this case.

The judgment is affirmed.

MOORE and LONG, JJ., concurred with MONTGOMERY, C. J. GRANT, J., did not sit.