[Sac. No. 2798.   In Bank.—July 24, 1918.]

## CHURCHILL COMPANY (a Corporation), Petitioner, v. W. S. KINGSBURY, Surveyor-General, etc., Respondent.

PUBLIC LANDS—SHORES OF NAVIGABLE WATERS—LITTLE KLAMATH LAKE. Land forming the shore of Little Klamath Lake, which is a navigable body of water, lying partly in California and partly in Oregon, and which land is covered by water at the ordinary seasonal high-water period and uncovered at seasonal low water is sovereign land of the state.

ID.—OWNERSHIP NOT GRANTED TO UNITED STATES—RESERVED IN THE SEVERAL STATES.—The shores of navigable waters and the soils under them were not granted by the federal constitution to the United States, but were reserved to the states respectively.

ID.—RIGHTS OF NEW STATES.—The new states have the same rights, sovereignty, and jurisdiction over the shores of navigable waters within their territorial limits and the soils under them as the original states.

ID.—TERRITORIAL EXTENT OF STATE TITLE.—The title of the state in the shores of navigable waters extends not only to the land underlying that part of a navigable stream or body of water over which navigation may be conducted, but extends to the entire bed, and in particular to the land which is covered and uncovered by ordinary rise and fall of the stream, tide, or lake.

ID.—NAVIGABLE WATERS DEFINED.—In England the only waters regarded as navigable are those in which the tide ebbs and flows, while in this country all waters are deemed navigable which are really so.

ID.—LAND UNDER NAVIGABLE WATERS—"BED" DEFINED—NOT LIMITED BY EXTENT OF AREA.—Land under navigable water which is covered or uncovered accordingly as the water is high or low is no less a part of the bed because it is extensive in area.

ID.—NAVIGABLE "LAKE" DEFINED.—A navigable lake consists of the body of water contained within the banks as they exist at the stage of ordinary high water.

ID.—SHORES OF NAVIGABLE WATERS — NOT SWAMP AND OVERFLOWED LANDS.—Lands on the shores of navigable waters periodically covered and uncovered by the natural seasonal rise and fall of the water are not swamp and overflowed lands within the meaning of section 3493s of the Political Code validating certain uncanceled certificates of purchase and payments made for lands as swamp and overflowed lands.

ID.—INLAND LAKES — LANDS UNCOVERED BY RECESSION OF WATERS — SALES BY STATE.—Such lands are not "lands now uncovered or which may hereafter be uncovered by the recession or drainage of the waters of inland lakes, and inuring to the state by virtue of her sovereignty," within the meaning of section 3493m of the Political Code, providing for the sale of such "uncovered" lands and "unsegregated swamp and overflowed lands."

ID.—LANDS UNDERLYING THE WATERS OF A LAKE NOT OPEN TO PURCHASE—STATUTES—LEGISLATIVE INTENT.—By the act of March 24, 1893, providing for the sale of lands uncovered by the recession or drainage of the waters of inland lakes and unsegregated swamp and overflowed lands (Stats. 1893, p. 341, now incorporated in sections 3493m et seq. of the Political Code), the legislature did not intend that lands underlying the waters of a lake should be open to purchase; the act was passed for the purpose, primarily, of meeting the conditions created by the gradual recession of Tulare Lake.

APPLICATION for Writ of Mandate against W. S. Kingsbury, Surveyor-General, and *ex-officio* Register of the State Land Office of the State of California.

The facts are stated in the opinion of the court.

Tapscott & Tapscott, A. E. Bolton, and O. K. McMurray, for Petitioner.

U. S. Webb, Attorney-General, and R. T. McKisick, for Respondent.

C. E. McLaughlin, and A. B. Reynolds, *Amici Curiae.*

SLOSS, J.—This is a proceeding in *mandamus,* brought to compel the state surveyor-general to perform the acts preliminary to the issuance to petitioner of a patent for 5,120 acres of land in Siskiyou County. An alternative writ was

ordered. The material facts are admitted, either by answer or by stipulation.

On October 11, 1872, one Dorris made application under the law of 1868 (Stats. 1867–68, p. 507) for the land in question, as swamp and overflowed land. The county surveyor of Siskiyou County made a survey, and returned the same to the surveyor-general. On October 4, 1874, the register of the state land office issued to Dorris certificate of purchase No. 4185 for said land, as swamp and overflowed land. Dorris and his successors in interest have ever since been in possession of said property, and have paid all taxes levied and assessed against it. On October 11, 1917, the petitioner, as successor to the interest of Dorris, presented to the county treasurer the certificate of purchase, made tender of the amount due for the balance of principal and interest, and took the further steps required under the law to entitle it to demand a patent. The tender and demand having been refused, this proceeding followed.

The land lies at the edge of Little Klamath Lake, a navigable body of water about eighteen miles long and half as wide, lying partly in California and partly in Oregon. Little Klamath Lake has no outlet and no separate watershed. It receives its main supply of water from Upper Klamath Lake, which is in Oregon. From Upper Klamath Lake water flows to Little Klamath Lake through a branch of the Klamath River. There is but a slight fall in the channel between the two lakes, and water flows through it to Little Klamath Lake only when the water in Upper Klamath Lake is high. In ordinary seasons the water in Little Klamath Lake reaches its maximum height about the month of April in each year. During the summer months the water level gradually falls, reaching its lowest point from August to November. Ordinarily, the difference between the high and the low water levels of Little Klamath Lake is about three feet. The land in question is part of a wide strip which, in ordinary seasons, is covered during the period of high water to a depth of about three feet, and is uncovered when the water is at its lowest stage, the latter condition continuing, usually, during the months of September and October. The strip which includes the tract in controversy slopes gently toward the center of the lake. At its inner edge there is an abrupt break or drop to a depth varying from four to seven feet. This break marks

the edge or bank of the lake at low water. There is, also, a distinct rise of several feet at the outer border of the strip. The land thus annually uncovered is fertile and susceptible of cultivation without further reclamation than such as would be necessary to exclude the water of the lake from it. Klamath River itself, as well as Little Klamath Lake, is navigable. A survey of the region was made under the authority of the United States in August, 1872. In making that survey a meander line was run along the ordinary high-water line of the lake and marked upon the land. No land was surveyed or lines run north or west of said meander line (i. e., below said high-water line), and no survey has ever been made by the United States of the lands (including those in controversy) beyond said meander line.

Whether the lands in question were swamp and overflowed lands, passing to the state by grant from the United States, or were lands lying under the waters of a navigable lake, belonging to the state by virtue of her sovereignty, the petitioner concedes that no right of purchase was vested in Dorris by the certificate, under the law as it stood when the certificate was issued. The statute then in force did not authorize the sale of swamp and overflowed land until six months "after the same has been segregated by authority of the United States." (Pol. Code, sec. 3441; *Garfield* v. *Wilson,* 74 Cal. 175, [15 Pac. 620]; *Wren* v. *Mangan,* 88 Cal. 274, [26 Pac. 100]; *Polk* v. *Sleeper,* 143 Cal. 70, [76 Pac. 819].) The pleadings and the stipulation of the parties show that there had been no segregation of the land below the meander line. So, likewise, the certificate of purchase was invalid if the land described in it was sovereign land of the state, there being at the time no law authorizing the sale of any such land, except tide-lands. (*Edwards* v. *Rolley,* 96 Cal. 408, [31 Am. St. Rep. 234, 31 Pac. 267].)

The petitioner relies upon the terms of the act of March 24, 1893, providing for the sale of lands uncovered by the recession or drainage of the waters of inland lakes and unsegregated swamp and overflowed lands. (Stats. 1893, p. 341.) This act, which, with its amendments, has been incorporated into the Political Code (sec. 3493m et seq., contains a provision validating certificates of purchase theretofore made for any lands as swamp and overflowed lands which belonged to any of the classes offered for sale by the act. The peti-

tioner claims, accordingly, that its certificate, although unauthorized by law at the date of its issue, was confirmed and made valid for all purposes by the statute just mentioned. Since the act authorizes the sale both of sovereign lands and of unsegregated swamp and overflowed lands, it might not be necessary for the petitioner to maintain that the lands in question fall within one of these classes rather than the other. It does, however, take the stand that the land is, in fact, sovereign land of the state, and in this, we think, it is clearly right.

Since the decision of the supreme court of the United States in *Pollard's Lessee* v. *Hagan*, 3 How. 212, 229, [11 L. Ed. 565], there has never been any question of these propositions, there laid down: "First, the shores of navigable waters, and the soils under them, were not granted by the constitution to the United States, but were reserved to the states respectively. Secondly, the new states have the same rights, sovereignty, and jurisdiction over the subject as the original states." In England the only waters regarded as navigable are those in which the tide ebbs and flows. The different conditions prevailing in this country have, however, led to the adoption of the broader rule that "all waters are deemed navigable which are really so." (*Barney* v. *Keokuk*, 94 U. S. 324, 336, [24 L. Ed. 224].) The title of the state extends not only to the land underlying that part of a navigable stream or body of water over which navigation may be conducted, but extends to the entire bed, and in particular to the land which is covered and uncovered by the ordinary rise and fall of the tide, stream, or lake. (*Barney* v. *Keokuk, supra; McManus* v. *Carmichael*, 3 Iowa, 1.) The agreed facts in this case show that the land in controversy is a part of the bed of Little Klamath Lake, a navigable body of water. During the greater part of the year, in ordinary seasons, the land is covered by the waters of the lake. It is uncovered only at times of low water. The extent of land covered by any navigable water must necessarily vary with the tide, or the rise or fall of the stream or lake. There will always be some land that is covered or uncovered as the water is high or low. Such land is no less a part of the bed because it is extensive in area. The record does not sustain the respondent's claim that the waters covering the lands in question are flood waters. The stipulation refers only to the high and low water stages

reached in ordinary seasons. The lake consists of the body of water contained within the banks as they exist at the stage of ordinary high water. (See *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59, [22 L. R. A. (N. S.) 391, 99 Pac. 502].) Such cases as *Niles* v. *Cedar Point Club*, 175 U. S. 300, [44 L. Ed. 171, 20 Sup. Ct. Rep. 124], and *State* v. *Lake St. Clair Fishing & Shooting Club*, 127 Mich. 580, [87 N. W. 117], relied on by respondent, are not in conflict with our conclusion. In each of them the decision was based upon the particular state of facts, which, in the view of the court, warranted a finding that the land was not a part of the bed of a lake, but was marsh or swamp land adjoining the border of the lake.

Section 3493s of the Political Code, which, as petitioner claims, validates the certificate of purchase, provides:

"All uncanceled certificates of purchase and patents heretofore issued, and payments heretofore made for any lands as swamp and overflowed lands, which belong to any of the classes described in section thirty-four hundred and ninety-three m, whether or not such lands were segregated or sectionized, are for all purposes valid, and have the same force and effect as if such lands had been at all times subject to sale as swamp and overflowed lands. . . . "

Section 3493m, which is referred to as describing the classes of land affected by the confirmatory provision, declares that "Any person desiring to purchase any of the lands now uncovered or which may hereafter be uncovered by the recession or drainage of the waters of inland lakes, and inuring to the state by virtue of her sovereignty, or the swamp and overflowed lands not segregated by the United States, must make an application therefor to the surveyor-general. . . . ".

As we have seen, the lands in question are not swamp and overflowed, and the petitioner can, therefore, prevail only by bringing them within the first class described in section 3493m, viz., "lands now uncovered or which may hereafter be uncovered by the recession or drainage of the waters of inland lakes, and inuring to the state by virtue of her sovereignty." We are satisfied that the effort to do this cannot succeed. The history of the legislation under discussion is well known. The act of 1893, which forms the basis of section 3493m, was passed for the purpose, primarily, of meeting the conditions created by the gradual recession of Tulare Lake. By that recession—which was believed to be permanent—large areas

of land over which the waters of the lake had stood became uncovered. Provision was accordingly made for the sale of such land to private owners. When the act speaks of lands "uncovered . . . by the recession . . . of the waters," it obviously does not refer to such a temporary uncovering as will take place annually in the course of the ordinary fluctuations of the water level. What was contemplated was a recession permanent or apparently so, not one that was merely seasonal or periodical. The lands in questions were not "now uncovered" when the act of 1893 was passed. Are they described by the further phrase, "lands which may hereafter be uncovered by the recession or drainage," etc.? The petitioner interprets this clause as meaning lands which *might* become so uncovered; in other words, lands whose future uncovering is within the bounds of possibility. We cannot assent to this interpretation. So read, the act would authorize the taking up of the entire bed of any inland lake, since, so far as anyone can say, it is possible that such lake may at some time dry up entirely, or else be completely drained. But surely the legislature did not intend that lands underlying the waters of a lake should be open to purchase. When it authorized the taking up of lands that "may hereafter be uncovered," it was applying to recessions, as and when they should occur in the future, the same rule that was being enacted for past recessions. In addition to offering for sale lands "now uncovered," it provided that if in the future any lands should in fact become uncovered by the recession or drainage of a lake, those lands should then be subject to purchase in the same way as if the uncovering had taken place prior to the passage of the act. As illustrating and supporting the propriety of this construction of the words "may be," as used in our code, we refer to two cases dealing with somewhat analogous employments of the phrase. (*Durfee* v. *Plaisted*, 38 Cal. 80; *Radcliffe* v. *St. Louis etc. Ry. Co.*, 90 Mo. 127, [2 S. W. 277].)

The lands embraced in the petitioner's application were not within the description of the statute. There is nothing in the pleadings, or in the stipulation of facts, to indicate that there had ever been any change in the natural conditions which we have outlined. The lands are still covered by the waters of the lake during the greater part of each year. Although the petition refers to the installation of reclamation works by the

United States, it is not alleged, even inferentially, that these works have in fact lowered the plane of Little Klamath Lake so as to uncover the lands in question.

Furthermore, we think section 3493s could have no greater effect than to validate certificates, etc., for lands then (i. e., at the time of the passage of the confirmatory act) belonging to one of the classes described in section 3493m. By the new legislation the state authorized the sale of certain classes of land not theretofore offered for sale, and at the same time validated certificates, patents, and payments already made for any of such lands as swamp and overflowed lands. The validating section was intended to operate presently. By its terms it confirmed pending or past proceedings for the purchase of lands which then fell within the description of section 3493m. It did not provide for a prospective confirmation, contingent upon a change of conditions which might, at some future time, bring the lands within the classes offered for sale by the new legislation. The contrary view would leave the status of unauthorized applications for the purchase of lands under navigable lakes forever uncertain. Whatever may be said about the present status of the land, there is no pretense that it had been uncovered by recession or drainage at the time section 3493s went into effect.

It follows that the petitioner has not established his right to any relief. We need not, therefore, go into a discussion of the other points argued by counsel. It appears from the answer that various contests between this petitioner and opposing applicants for purchase of portions of the lands are pending in the superior court, pursuant to reference by the surveyor-general (Pol. Code, sec. 3414). It should perhaps be said that the rights of the contestants are not foreclosed by our decision herein, which is, of course, based upon the facts as stipulated by the parties to this proceeding.

The alternative writ is discharged, and the proceeding dismissed.

Shaw, J., Richards, J., *pro tem.*, Wilbur, J., Lorigan, J., Melvin, J., and Angellotti, C. J., concurred.

Rehearing denied.