OLDS v. COMMISSIONER OF STATE LAND OFFICE.[1]

1. JOINT RESOLUTIONS—NATURE OF.
   A joint resolution is a form of legislation used chiefly for administrative purposes of a local or temporary character.

2. SAME—CONSTITUTION—ENACTMENT OF LAWS.
   Section 19, art. 4, of the Constitution, providing that every bill and joint resolution shall be read three times in each house, and shall not become a law without the concurrence of a majority of all the members elected to each house, is a recognition of the former practice of giving a resolution the force of a law when its effect is to authorize a single act.

3. SAME.
   Joint Resolution No. 18, Pub. Acts 1887, authorizing the commissioner of the State land office to issue patents for certain State swamp lands to the executor of William M. Ferry or his assigns, was not unconstitutional on the ground that it attempted what only could be accomplished by a bill enacted into a law.

4. SAME—ALLOWING PRIVATE CLAIMS BY LEGISLATURE.
   A joint resolution providing for the payment of an admitted obligation of the State by the appropriation of certain State swamp lands does not conflict with section 31, art. 4, of the Constitution, prohibiting the legislature from auditing and allowing private claims.

5. SAME—SELECTION OF SWAMP LANDS—STATE'S TITLE—PATENT.
   A resolution permitting a person to select a certain number of acres of any State swamp lands not otherwise appropriated does not limit him to lands subject to entry, but he may select

[1] The opinions filed on the original hearing in this case were withheld from publication pending the rehearing.

from lands the title to which has vested in the State, though they have not been patented to the State by the United States.

6. SWAMP LANDS—GREAT LAKES.

Submerged land lying below the low-water mark of Lake St. Clair, and as such duly meandered by the federal surveyors, is not within the swamp-land act of 1850. Per HOOKER, J.

ON REHEARING.

1. HIGHWAYS—CONTRACT FOR CONSTRUCTION—PAYMENT IN LANDS —STATUTES.

Act No. 338, Laws 1865, authorized the construction of a highway, to be paid for in State swamp lands then subject to entry, and provided that the contract should be let in accordance with the provisions of Act No. 117, Laws 1859, which contained a provision that the contractor might elect to take his pay in money or in lands, then valued at $1.25 an acre. *Held,* that the.contract for the construction of the highway could not be let for a money consideration.

2. SAME—CONSTITUTIONAL LAW—EXTRA COMPENSATION.

A person built a road under an act entitling him to receive in payment a certain number of acres of State swamp lands in Ottawa county, which the State then valued at $1.25 an acre. After the contract was let, the State changed the market price of its swamp lands to $8 an acre. When the road was completed, the State owned no swamp lands in Ottawa county. *Held,* that a resolution passed by the legislature, permitting the contractor's assigns to select the lands from any swamp lands in the Lower Peninsula, did not conflict with the constitutional provision (section 21, art. 4) prohibiting the granting of extra compensation to a public contractor after the services have been performed.

*Mandamus* by Schuyler S. Olds to compel William A. French, commissioner of the State land office, to permit the location of certain alleged swamp land. The Michigan Land & Lumber Company, Limited, intervened. Submitted June 22, 1901. (Calendar No. 17,558.) Writ granted July 10, 1901. Motion for rehearing granted October 15, 1901. Submitted on rehearing June 9, 1903. Former decision affirmed September 22, 1903.

*Walker & Spalding,* for relator.

*Frank E. Robson,* for intervener.

*Horace M. Oren,* Attorney General (*Avery Bros. & Walsh,* of counsel), for respondent.

MONTGOMERY, C. J.   The relator asks a writ of *mandamus* to compel the commissioner of the State land office to permit the location of certain lands on the "St. Clair Flats," so called, with certain scrip which he holds as assignee of the estate of William M. Ferry.

Act No. 338, Laws 1865, provided for the laying out and establishing of a State road from Ferrysburg, in Ottawa county, to the mouth of Black creek, in Muskegon county. Under the provisions of the act, the improvement was to be paid for by an appropriation of swamp lands, the provision being that for that portion of the work in Ottawa county the selection should be made from swamp lands in Ottawa county.   William M. Ferry became the contractor. Before the road was completed, all the swamp lands in Ottawa county had been disposed of.   In 1887 the legislature, by joint resolution, provided that the executor of William M. Ferry, or his assigns, "be and they are hereby authorized to select the said amount of 799.10 acres from any State swamp land in the Lower Peninsula not otherwise appropriated, and that, upon filing the lists of lands so selected with the commissioner of the State land office, he cause patents to be issued therefor."   Pub. Acts 1887, Joint Res. No. 18.

The petition alleges that the lands in question are swamp lands, granted to the State of Michigan under the act of Congress of September 28, 1850, commonly known as the "Swamp-Land Act," which the answer admits.   It appears that the State has never received a patent for these lands from the federal government.   In 1885 the State applied for a survey of the swamp and overflowed lands in the township where these lands are located, which was refused in 1886.   In 1887 the State caused a

survey to be made, and requested the United States authorities to issue patents for the lands, but this request was refused.  The Michigan Land & Lumber Company, Limited, has intervened in this proceeding, it having made application to locate the same lands under other scrip.

The case is of great importance, it being stated that the lands involved are worth hundreds of thousands of dollars, and it being also stated that many of the lands are in occupation of settlers, who have made valuable improvements thereon, and that the application of relator is in their interest.  It is apparent that, if either the relator or the intervener is entitled to have these lands patented, the State will part with a valuable property for but a fraction of its value.  This consideration cannot control our decision in determining the rights of the parties, but will call for a careful consideration of the case.

It is contended that the resolution is invalid for various reasons, and that, if valid, it is not open to a construction which confers a right upon the representatives of Mr. Ferry to select the lands in question.

It is contended that the resolution attempted what only can be accomplished by a bill enacted into a law. Numerous cases are cited to sustain this contention.  The case of *Collier, etc., Lithographing Co.* v. *Henderson,* 18 Colo. 259 (32 Pac. 417), involves a construction of the constitutional provision that "no law shall be passed except by bill."  *Mullan* v. *State,* 114 Cal. 578 (46 Pac. 670 34 L. R. A. 262), construed a constitutional provision couched in the same language.  This is also true of the case of *May* v. *Rice,* 91 Ind. 546.  The case of *Burritt* v. *Commissioners of State Contracts,* 120 Ill. 322 (11 N. E. 180), holds that, under a constitutional provision that "no money shall be drawn from the treasury except in pursuance of an appropriation made by law,   *   *   *   and no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution," it was incompetent for the legislature, by joint resolution, to provide for the expendi-

ture of $10,000 for "Township Organization Laws," to be paid out of an appropriation made by law for printing and binding. It will be seen that each of the above cases rests upon restrictive provisions not contained in our Constitution. The case of *State* v; *Kinney*, 56 Ohio St. 721 (47 N. E. 569), is distinguishable from the case under discussion. The constitution of the State of Ohio does· not recognize action by joint resolution, as ours does, as will be seen later on. *State* v. *Rogers*, 10 Nev. 250 (21 Am. Rep. 738), is not in point, as the question there involved is whether the omission of the enacting·clause in a statute is fatal. The decision is in line with *People* v. *Dettenthaler*, 118 Mich. 595 (77 N. W. 450). The case of *Boyers* v. *Crane*, 1 W. Va. 176, appears to be a case of first impression, and tends to sustain the contention of respondent's counsel, but falls short in this: That the constitution of West Virginia contains no such provision as that found in section 19, art. 4, of our Constitution. We do not read the case of *State* v. *Dahl*, 6 N. Dak. 81 (68 N. W. 418), as supporting respondent's contention; while *Barry* v. *Viall*, 12 R. I. 18, is, so far as it is authority, support for relator's claim. A joint resolution is described to be "a form of legislation which is in frequent use in this country, chiefly for administrative purposes of a local or temporary character." Cush. Law & Prac. Leg. Assem. § 2403.

The relator's counsel have referred us to a large number of instances in which the legislature, prior to 1850, proceeded by joint resolution, in form corresponding to the one here involved, where the measure adopted was limited to a single occasion, and not designed to be a permanent law. Under joint resolutions, the State released its interest in certain real estate (No. 22, Laws 1842); authorized the payment of certain claims from the general fund (No. 23, Laws 1843); authorized the issue of certificates of purchase without full payment for lands (No. 21, Laws 1844); authorized the conveyance of lands (No. 17, Laws 1845); authorized the selection by a canal contractor of certain internal improvement lands, instead of those

which could be located under warrants which he had received for his work. For this last provision, see No. 36, Laws 1849. In the light of this legislative practice, the Constitution of 1850 should be construed. Section 19, art. 4, provides:

"Every bill and joint resolution shall be read three times in each house before the final passage thereof. No bill or joint resolution shall become a law without the concurrence of a majority of all the members elected to each house."

This provision is a clear recognition of the custom prevailing under the Constitution of 1835. The same practice of adopting resolutions which are given the force of law has prevailed under the present Constitution, where the effect of the resolution is to authorize a single act. The instances are numerous.

It is contended by respondent that the resolution is an attempt to audit and allow a private claim, within the meaning of section 31, art. 4, of the Constitution, and is invalid for this reason. We do not think the resolution open to this objection. The claim of relator was fully established. The resolution simply made provision for meeting an admitted obligation of the State.

It is further contended that to give the resolution the effect contended for by relator makes it invalid under section 21, art. 4, which prohibits the legislature from granting or authorizing extra compensation to any public officer, agent, or contractor after the service has been rendered or the contract entered into. The legislature of 1869 (by Act No. 97) caused the swamp lands then remaining to be graduated in price. It is claimed the relator's scrip could be thereafter used in the purchase of these lands only at the price of $1.25 per acre, and therefore the resolution of 1887, if construed as giving the right to select any lands in the Lower Peninsula in lieu of those in Ottawa county, gave enlarged compensation to the contractor. The force of this contention is lost if the premise is not well taken. If the contractor had the right to select any

swamp lands in Ottawa county without regard to the gradation of price for sales to purchasers for cash, the only effect of the resolution was to permit the selection of lands in other counties instead of in Ottawa county. This would not be an enlargement of compensation, but the substitution of lands in other counties to make payment in kind in accordance with the contract already executed. At the date of the act in question there was no gradation as to price. All patented swamp lands were subject to entry, and subject to selection by the contractor. The language was, "the swamp lands now subject to entry." The subsequent gradation of price could not affect this right.

The remaining question is, What construction should be placed on the joint resolution? It is contended by the respondent that the resolution is to be construed in connection with Act No. 338, Laws 1865, and that, although the language of the resolution is broad enough to include all swamp lands, it should be limited to lands of the class named in Act No. 338, viz., lands subject to entry. A similar contention was made in *State* v. *Sparrow*, 89 Mich. 263 (50 N. W. 1088). It was there held that the grant to the State of swamp lands by the act of Congress was a grant *in præsenti;* that a grant by the State of any swamp lands not otherwise appropriated included lands which had not been patented to the State by the United States, but which had been duly selected, so that the title had vested in the State, and the lands had been identified. The language of the resolution is not materially different, and we must hold that the question is ruled by *State* v. *Sparrow.* See, also, *People, ex rel. County of Houghton,* v. *Commissioner of State Land Office,* 23 Mich. 270.

This opinion is based upon the record as made. It is not intended to pass upon the question whether these lands are a part of the bed of St. Clair Lake in a manner to conclude the parties.

The writ will issue as prayed.

MOORE, J., concurred with MONTGOMERY, C. J.
LONG and GRANT, JJ., did not sit.

HOOKER, J. (*dissenting*). The petition asks that the
respondent be compelled to issue a patent for 757.44 acres
of land situate on what is commonly known as "St. Clair
Flats." I understand that it is not claimed that the same
is, in the main, other than submerged land, below low-
water mark of the lake.

Lake St. Clair is one of the Great Lakes, and as such
was duly meandered and its boundaries defined by federal
surveyors at an early day. Such being the case, none of
the submerged land was within the swamp-land act of
1850, except swamps upon well-defined islands, if there be
any. We will take judicial notice that many square miles
of the lake within such meander lines are covered with
wild grass, wild rice, rushes, and other aquatic plants,
which grow only in the water, and not upon land periodi-
cally dry. Such lands were not within the contemplation
of the swamp-land act, and it would be a violation of the
trust confided in the federal government by Virginia, in
its cession of the lands, if they had been included in said
act, even if the government had not lost its title by the
admission of Michigan to the Union.

Well-defined islands, visible above water, may have
swamps within their confines, as we held in *People* v.
*Warner*, 116 Mich. 228 (74 N. W. 705); but the fact
that they are surrounded by submerged lands, in which
aquatic plants grow, does not impart to such islands the
character of swamp lands, within the act, nor would the
fact that said islands contain swamp lands affect the
character of such surrounding lands as submerged lands.
There is no case on record, so far as I am aware, where
the federal government has sought to convey submerged
lands in a lake within the meander lines, and it has been
its general policy to refuse to do so. An apparent excep-
tion in the case of *Niles* v. *Cedar Point Club*, 175 U. S.
300 (20 Sup. Ct. 124), will be found not to be such, as that

land was unsurveyed swamp and overflowed land lying between a former survey and the shore of the lake.

The writ should be denied.

ON REHEARING.

CARPENTER, J. This case was decided by this court July 10, 1901, and is reported *supra* (86 N. W. 956). A rehearing was ordered, and there are now in the controversy two distinct issues, viz.: (*a*) Is the land in controversy swamp land? This issue does not, however, relate to so much of the land as was involved in the suit of *State* v. *Lake St. Clair Fishing & Shooting Club*, 127 Mich. 580 (87 N. W. 117), that having been determined in that case to be swamp land. (*b*) Is relator's scrip valid to take the land in question, if it is in fact swamp land? This decision relates only to the second of these issues, and it concerns only relator and the intervening petitioner, the Michigan Land & Lumber Company, Limited; for, if the land is in fact swamp land, the scrip of the intervener will take it if that of relator will not. It leaves to be subsequently determined in this suit the first issue. All the questions involved in this case relate to the construction and validity of a joint resolution passed by the legislature in 1887 (see Pub. Acts 1887, No. 18), under which relator claims his rights. Intervener contends:

*First.* That the proper construction of said joint resolution does not give relator the right to take the land in question with his scrip.

*Second.* That said joint resolution is unconstitutional because it is prohibited by section 31 of article 4 of our State Constitution, which provides:

"The legislature shall not audit nor allow any private claim or account."

*Third.* That said resolution is unconstitutional because it is prohibited by section 21 of article 4 of our State Constitution, which provides:

"The legislature shall not grant nor authorize extra compensa-

tion to any public officer, agent, or contractor after the service has been rendered or the contract entered into."

We are entirely satisfied with our former opinion in so far as it relates to the first and second of the above-named objections, and shall refrain from further discussion of them. We will, however, proceed to discuss the third of said objections. The facts, so far as material to the question under consideration, are these: Relator obtained his scrip from the estate of William M. Ferry, deceased. That scrip evidenced the State's obligation to compensate said estate for the services of said Ferry in building a road in the counties of Ottawa and Muskegon. This road was completed in 1867. By the law under which the contract to build said road was let, as well as by the contract itself, said Ferry was to be compensated by the conveyance of State lands then subject to entry, situated in the counties of Muskegon and Ottawa. Shortly after the completion of the contract, said Ferry received from the State a conveyance of all the land to which he was entitled in the county of Muskegon. There remained due him, however, 799.10 acres, which, by the terms of said law and contract, were to be selected from land subject to entry in said county of Ottawa.

The law under which the contract to construct said road was made and the scrip earned is Act No. 338, Laws 1865. That law contained this provision:

"*Provided*, that the State shall not be chargeable with any of the expense, * * * except as hereinafter provided. * * * For the purpose of aiding in the construction of said road, there is hereby appropriated 320 acres per mile of the swamp lands now subject to entry."

The law also provided that the contract should be let in accordance with the provisions of Act No. 117, Laws 1859. The act last named contained a provision that the contractor for the construction of roads might elect to take his pay in money, or in lands at the price of $1.25 an acre. The contract to build the road in question contained a recital that the contractor had elected to take his pay in

land.   The books in the department of the commissioner
of the State land office kept the account of the State with
relator's assignor in dollars, on the basis that each acre of
land was worth $1.25.    All the land subject to entry at the
time the contract was made and performed was for sale at
$1.25 an acre.

Upon the completion of the contract, in 1867, there was
not in Ottawa county, subject to entry, sufficient land, if
there was any, to satisfy the State's obligation to relator's
assignor.    Therefore, the legislature, in 1887, passed the
joint resolution in question ( see Pub. Acts 1887, No. 18),
giving relator's assignor the right to take in satisfaction
of his claim 799.10 acres of the State swamp lands from
any in the Lower Peninsula not otherwise appropriated.
As the legislature had in 1869 ( see Act No. 97, Laws
1869) passed the so-called "Graduation Act," by which
lands thereafter offered for sale were placed on the market
at the rate of $8 per acre, the effect of this resolution was
to give 799.10 acres of land in 1887, which the State was
holding at $8 an acre, in lieu of a claim for 799.10 acres of
land, which the State in 1865 was holding at $1.25 an
acre; in other words, the effect of the resolution gave land
which the State in 1887 valued at $6,392.80 to satisfy a
claim for land which in 1865 it valued at $998.88.    Inter-
vener contends that relator's assignor had a claim against
the State for the amount of $998.88, payable in land, and
that by the joint resolution under consideration he is
allowed $6,392.80, payable in land, and that said joint
resolution attempts to grant the contractor extra compen-
sation, and is therefore unconstitutional.

If the assumption underlying this argument is well
founded, the argument is conclusive.    It will be observed,
however, that the strength of the argument depends, not
on the fact that an acre of land of the market value of $8
is exchanged in 1887 for an obligation to convey an acre of
land of the market value of $1.25 in 1865 (a subject which
will be hereafter referred to), but upon the assumption that
the claim of relator's assignor was a money claim, payable in

land.   We are bound, however, to say that this assumption
is not well founded.   In our judgment, it is not true, as
assumed, that the State, from 1867 to 1887, owed relator's
assignor $998.88, payable in land.   The provision of the
act of 1865, that the contract should be let in accordance
with the provisions of Act No. 117, Laws 1859, did not,
as contended by intervener, empower the commissioner
therein named to let the contract for a money considera-
tion.   The provision in the act of 1865, "The State shall
not be chargeable except as hereinafter provided," limited
the obligation of the State to the lands thereinafter appro-
priated, and therefore clearly forbade its commissioner
obligating the State to pay money to the contractor.   Nor
can we give any effect whatever to the recital that the
contractor elected to take his pay in land, contained in the
contract for the construction of the work in question.
That recital is inconsequential and nugatory.   He was
bound to take his pay in land by the express language of
the statute.   It seems scarcely necessary to state that the
books in the office of the land commissioner, showing the
amount due to relator's assignor to be dollars instead of
acres, had no effect upon the obligation of the State, which
was fixed by an act of the legislature.   It follows, there-
fore, that in 1887 the State had no right to compel relator's
assignor to accept money in satisfaction of this claim, and
it was obligated to deliver to him 799.10 acres of land,
situated in the county of Ottawa, and subject to entry in
1865.

Was it extra compensation to give in lieu of this obliga-
tion other land not otherwise appropriated?   The State
had disabled itself from carrying out its agreement.   It
was therefore under an obligation to compensate the loss
of relator's assignor, to deliver to him lands equal in value
to those promised him.   Unless, therefore, we can say
that the land which the contractor gets under the joint
resolution is of greater value than that to which he was
entitled, we cannot say that he received extra compensa-
tion.   It is true that the land promised was in 1865 sub-

ject to entry at $1.25 per acre, and that the land delivered under the resolution of 1887, if it comes into the market at all, will, by virtue of the graduation act of 1869, be placed thereon at $8 per acre. Shall we say that because one gets land which the State in 1887 values at $8 per acre, in lieu of land which in 1865 it valued at $1.25 an acre, he is receiving extra compensation? We do not know that the land promised had not a greater intrinsic value than $1.25 an acre. In 1887 it may have been apparent to the legislature that the land promised equaled or exceeded in value that which could be taken under the joint resolution. We cannot, therefore, say that the intrinsic value of the land held by the State in 1865 at $1.25 an acre is not as great as that of land held by the State in 1887 or in 1903 at $8 per acre. We cannot say that the intrinsic value of the land which relator will get in satisfaction of his obligation exceeds that promised him. The most that may be said is that it is possible that it may exceed that. This possibility gives this court no authority to declare unconstitutional a resolution passed in due form by the legislative branch of the government. All doubts of this character must be so resolved as to sustain the law. *Rumsey* v. *People*, 19 N. Y., at pages 46–49; *Lusher* v. *Scites*, 4 W. Va., at page 14 *et seq.*

The result of this decision is to sustain our former opinion, which, like the present, was, as contended by intervener's counsel, "based upon the view that the measure of compensation to be paid the contractor was acres of land." It follows that relator is entitled to a *mandamus* requiring respondent to execute a deed of the land in controversy in the case of *State* v. *Lake St. Clair Fishing & Shooting Club*, 127 Mich. 580 (87 N. W. 117). Whether he is entitled to a deed of the remaining land in controversy depends upon the determination of the other issue involved in this suit, which, as heretofore stated, will be subsequently determined in this suit.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred. GRANT, J., did not sit.