OLDS *v.* COMMISSIONER OF STATE LAND OFFICE.[1]

MICHIGAN LAND & LUMBER CO. *v.* SAME.

1. ESTOPPEL — JUDGMENT — MATTER OF RECORD — PERSONS EN-
   TITLED TO ALLEGE ESTOPPEL.

   The action of the State in prosecuting to a successful conclu-
   sion an action of ejectment against persons occupying with-
   out title certain lands which the State claimed to be State
   swamp lands does not estop the State from claiming that
   other lands similarly situated are not swamp lands and are
   therefore not subject to location with swamp land scrip, the
   holders of the scrip not having been parties to the ejectment
   suit nor induced to purchase the scrip in the belief that it
   could be used to locate such lands.

2. JUDGMENT—ESTOPPEL—MATTERS CONCLUDED.

   The affirmance of a judgment in ejectment founded on a finding
   of fact that the land in controversy was swamp or overflowed
   land is not conclusive as to the character of the land in a
   proceeding in which the facts are before this court for deci-
   sion, since this court is bound by the facts found by the
   court below in an action at law if supported by the evidence.

3. ESTOPPEL—STATE OFFICERS — CHARACTER OF LANDS — SURVEY.
   The action of the commissioner of the State land office in 1887
   in having a survey made of certain lands and attempting un-
   successfully to induce the United States authorities to adopt
   said survey and issue patents for the lands under the swamp
   land act of 1850 (9 U. S. Stat. 519) does not estop the State
   from subsequently denying that the lands were swamp lands
   in 1850 if they were not in fact swamp lands in 1850

4. PUBLIC LANDS — SWAMP LANDS — CHARACTER — LEGISLATIVE
   DECLARATION.

   The survey and sale act of 1899 (Act No. 175) relative to "the
   swamp and overflowed lands within the delta of the St. Clair
   River" is not such a legislative declaration of the character
   of the lands as to prevent the court and the land commis-
   sioner from asserting that such lands are a part of the bed of
   the lake and not swamp lands.

[1] The opinions filed on the original hearing in this case were with-
held from publication pending the rehearing.

5. SAME—SUBMERGED LANDS—TITLE.

    Lands which were in 1837 a part of the bed of one of the Great Lakes passed to the State in fee by virtue of the State's admission into the Union in that year, and the swamp-land act of 1850 (9 U. S. Stat. 519) had no effect upon the title to such lands.

6. SAME—CHARACTER OF LANDS—EVIDENCE—EFFECT.

    On the issue as to the character of the lands lying at the delta of the St. Clair River, evidence examined, and *held,* that at the time of the admission of this State into the Union said lands were a part of the bed of Lake St. Clair, the fee of which passed to the State with other submerged lands, and were not swamp or overflowed lands within the meaning of the swamp-land act of 1850 (9 U. S. Stat. 519).

Mandamus by Schuyler S. Olds to compel William A. French, commissioner of the State land office, to permit the location of certain alleged swamp land. The Michigan Land & Lumber Company, Limited, intervened. The writ issued as to a portion of the land claimed, and issues were ordered to be framed and referred to Wilbur J. Beach, special commissioner: On the report of said commissioner. Submitted May 25, 1906. (Docket No. 164.) Writ denied July 15, 1907. Rehearing denied December 10, 1907.

*H. E. Spalding,* for relator.

*Frank E. Robson,* for intervener.

*John E. Bird,* Attorney General (*Lincoln Avery* and *Chauncey H. Gage,* of counsel), for respondent.

MOORE, J. Some phases of the litigation involved in these proceedings were discussed and decided in *Olds* v. *Commissioner of State Land Office,* 134 Mich. 442. A reference to the opinions then filed will aid in understanding the issues here involved. In the original hearing but three justices took part. Justice HOOKER was of the opinion that the lands involved were submerged lands and were not within the swamp-land act of 1850 (9 U. S. Stat.

519). In the opinion written by Justice MONTGOMERY, concurred in by Justice MOORE, it was said:

"This opinion is based upon the record as made. It is not intended to pass upon the question whether these lands are a part of the bed of St. Clair Lake in a manner to conclude the parties."

Upon the rehearing, in an opinion by Justice CARPEN-TER, it was said there are in the controversy—

"Two distinct issues, viz.: (*a*) Is the land in controversy swamp land ? This issue does not, however, relate to so much of the land as was involved in the suit of *State* v. *Lake St. Clair Fishing & Shooting Club*, 127 Mich. 580); that having been determined in that case to be swamp land. (*b*) Is relator's scrip valid to take the land in question if it is in fact swamp land ?"

The opinion then disposes of issue "*b*" and concludes with the statement:

"Whether he is entitled to a deed of the remaining land in controversy depends upon the determination of the other issue involved in this suit, which, as heretofore stated, will be subsequently determined in this suit," referring to issue "*a*."

Subsequently, an order permitting it having first been obtained, amended answers were filed which were substantially alike. In the answer to Mr. Sparrow's petition, in the fifth clause, the respondent states that he refuses to issue certificates for patents for the following reasons:

"(*a*) That they are not swamp and overflowed lands within the meaning of the swamp-land grant of September 28, 1850, and petitioner is not entitled to select the same as and for swamp lands.

"(*b*) That they are submerged lands and a part of the bottom of Lake St. Clair, and became the property of the State in its admission into the Union.

"(*c*) That the lands have never been identified by the Federal or State government as swamp lands, within the meaning of the act of Congress granting swamp lands to the State of Michigan.

"(*d*) Act No. 130 of the Public Acts of Michigan of the year 1883, does not authorize the petitioner to select

swamp lands the character of which was determined and identified as swamp lands subsequent to the approval of the act.

"(e) Act No. 130 of the Public Acts of Michigan of the year 1883, appropriated to the county of Livingston only such swamp lands as were at the date of approval of said act patented to the State or were at that date identified as such by competent authority, State or Federal; the approval being dated May 31, 1883.

"(f) That no application has ever been made by the State to the Federal government for a survey or identification as swamp lands of that portion of the lands described in the relator's petition, not included in Harsen's or Stromness' Islands, and there has been no refusal on the part of the Federal government to survey or identify such lands as swamp lands under the act of 1850."

We then thought the important question in the case to be whether the land in controversy is swamp land and within the provisions of the swamp-land act of 1850. Before proceeding with this important inquiry, it is necessary to dispose of some preliminary questions raised by counsel for the relators. The following extract from the brief of counsel will cover these questions:

"We claim:

"(a) That the respondent land commissioner, by the act of his predecessor approving the Bartholomew survey, and by the State's continued assertion in litigation of their character as swamp up to the time of the relator's application, is estopped from asserting that they are of different character.

"(b) That the survey and sale act of 1899 (Act No. 175, Pub. Acts 1899), under which the Davis survey was made, is a legislative declaration that these lands are swamp and overflowed in character, binding upon the respondent and upon all departments of the State government.

"The first proposition only is one of estoppel; the second rests upon the broader principle that a determination by the State legislature of the character of State lands is binding upon the courts and upon the land commissioner like all other departments of the State government. He cannot assert that to be bed of the lake which the legislature has declared to be swamp.

" It appears by the facts already recited that from 1885 down to the original decision of this case in 1901, the land department of the State continually claimed that the St. Clair Flats, including the lands in question, were swamp lands passing to the State under the act of 1850, and dealt with them on that footing.   In this course of dealing, the Bartholomew survey, showing the lands to be swamp lands, was made and was formally approved by the commissioner of the State land office in December, 1890.

" After the survey was approved, the land office continued for three years its attempt to obtain the adoption of this survey as a government survey.   After this attempt failed, four test suits in ejectment—the Old Club Case among them—were begun by the State based upon the Bartholomew survey and upon the claim that the Flats are swamp lands.   In the Old Club case the State succeeded in this contention, establishing that the premises occupied by the club were swamp lands; the evidence of that character being such as to apply with even greater force to the other lands here in controversy.   The findings of the court in that case, included the statement that the Old Club premises, were the termination of a strip of land which was a prolongation of Harsen's Island, all of which was swamp land.

" The approval of the Bartholomew survey has never been revoked or canceled.   No resurvey to redetermine the character of the lands has ever been ordered, either before relator's application or since.   Under these circumstances, the relator had a right to locate in reliance upon the approved survey, and the respondent cannot in this suit attack the determination of the character of the lands so made."

In relation to the ejectment suits, it must be remembered that neither of the relators was a party therein.   In the suit commenced by the State against Don M. Dickinson, the defendant won out.   In the case against the Lake St. Clair Fishing & Shooting Club, it appears that but four justices took part; Justice HOOKER maintaining that the State obtained title to the lands by virtue of its admission to the Union.   In the court below the case was tried before the circuit judge, who found as a fact that the lands involved in that case were a continuation of Harsen's

Island.  Justice MONTGOMERY in his opinion applied the
familiar rule that, if there was evidence to sustain the
verdict of a jury or a finding of the circuit judge as to a
question of fact, the verdict or finding would not be dis-
turbed.  He was of the opinion that there was evidence
to sustain the finding.  The writer of this opinion agreed
with Justice MONTGOMERY, and the judgment of the
lower court was affirmed.  The opinion was based upon
this finding of fact and was not based upon the theory
that the land was sufficiently shown to be swamp land
simply because it was so designated by the Bartholomew
survey.  Had the question of fact in that case been for
this court, instead of for the trial court, to decide, it is not
at all certain the case would have been affirmed.

As to the effect of the Bartholomew survey, and what
was done in relation thereto by the State land office, it
must be remembered that this survey was made 37 years
after the swamp-land act of 1850.  A further examina-
tion of the situation satisfies us still more than before that
Justice HOOKER rightly characterized this survey, when
he said in his opinion in the *Fishing & Shooting Club
Case:*  "It does not indicate with any accuracy the lim-
its of submerged land."  An attempt was made to get the
Federal authorities to approve of it.  This attempt failed.
Whatever value it may have as showing the situation in
1887, it is very clear that it does not accurately show the
situation in 1850, before any person had located upon the
lands in controversy, and we think there has been noth-
ing done in relation to said survey which should preclude
the State from asserting that these lands were submerged
lands in 1850, if they were then in fact submerged lands.

As to the survey and sale act of 1899, if any inferences
are to be drawn, they must be drawn, not from an isolated
sentence or two, but from the entire act.  It is true it is
entitled "An act to provide for the sale, disposition and
control of the unpatented swamp and overflowed lands in
the township of Clay."  The act provides for the survey
of certain lands.  It provides that persons then in posses-

sion may buy the lands then occupied or improved by them, upon very favorable terms. It then provides that certain other lands are forever reserved as a public hunting and fishing resort. A reading of the act makes it very clear that the legislature had no thought that by passing the bill it was so characterizing these lands that they would be subject to entry under the general law of the State applicable to swamp or overflowed lands, or would be subject to location by State swamp-land scrip. Upon the contrary, the legislation was for an entirely different purpose. The record discloses that when the swamp-land scrip which forms the basis of relators' claims was earned, and when it was given new life by the legislature, neither the legislature nor the owners of the scrip had the remotest idea that it could be used to secure title to the low lands at the delta of the St. Clair river.

As before stated, the relators in this case were not parties to the previous litigation. They were not induced to purchase this scrip relying upon the claim that the State had held out to them the hope it could be used for the purpose for which it is now attempted to be used. The elements of estoppel are lacking in this case. It is proper to add to what has already been said that substantially the same claims were made by Mr. Spalding upon page 2 of his brief, filed in opposition to the motion for a rehearing. Notwithstanding this claim, we have shown, by quoting from the opinion of Justice CARPENTER, that we were then of the opinion that the issue of whether these were swamp lands should be decided upon the merits after a full hearing. Upon the issue so framed, a mass of testimony has been taken requiring a printed record of 900 pages. A large number of maps were introduced in evidence, and a still larger number of photographs. The case is ably and carefully briefed, and at great length, in which are discussed all the issues raised by the amended answers.

Counsel are all agreed that, if the question is open for discussion, the inquiry should be : Were these swamp or

overflowed lands in 1850, or were they submerged lands?
In addition to the documentary evidence in the case, which
included tables showing the height of the water level for a
long series of years, the relator introduced the oral testi-
mony of several witnesses, whose testimony strongly
tended to show that since the witnesses have known the
lands they were marsh lands. The personal knowledge
of three of these witnesses did not go further back than
1874. One witness was first upon the ground for a short
time in 1856 with a party of government engineers.
Upon the part of the State, the oral testimony of five
captains of lake vessels was taken, and of at least a half
dozen old residents of the vicinity. These men claimed
to have knowledge of the situation prior to 1860, and
some of them prior to 1850. Their testimony tends to
show that, at the early dates about which they testified,
the lands in controversy were submerged lake bottom, and
not marsh land. Mr. Morley gave testimony explaining
the surveys prior to and the making of the Davis map.
Mr. Molitor gave testimony explaining the map of 1867
and the significance of the symbols and marks thereon.
Both of them also gave testimony in reference to the char-
acter of the land, reference to which will be made later.
Mr. Havens gave testimony as to what was, and was not,
done in relation to these lands in the State land depart-
ment. The State geologist testified in relation to how the
delta was formed, in his opinion. Other witnesses also
testified upon the part of the State.

Counsel for relators have made an analysis of all the
testimony, laying special stress upon the value as evidence
of the maps, the photographs, the tables of water levels,
and the early correspondence. They argue therefrom,
and we quote from the brief:

"There is necessarily and naturally some discrepancy
in the testimony of the different witnesses in matters of
detail. That is to be expected, and it is unimportant.
The testimony, however, of most witnesses, and of all
whose testimony is entitled to any considerable weight, is

on all material points substantially in accord and supports
the proposition for which we contend; that is, that there
has been no substantial change either in the character or
extent of the land at the Flats since the earliest times of
which we have any evidence. Practically all the land
covered by relator's application is under present condi-
tions above low-water mark, and those parts of it which
have been filled or raised would be so in their natural con-
dition. This is not seriously disputed. Practically with-
out exception the witnesses support it, and ample corrob-
oration is found in Davis' survey.

"The question, then, is whether the present condition
existed in and prior to 1850, or whether it results from re-
cession or the water below a normal low-water level ex-
isting before 1850, or is due to an elevation and growth
of the land either by a deposit of silt or an accumulation
of decayed vegetation."

They insist there has been no substantial change since
1850, and that then, as well as now, the land was marsh
and overflowed, and not lake bottom; counsel citing in
that connection *Lincoln* v. *Davis*, 53 Mich. 375.

Counsel for the State also analyze the testimony bear-
ing upon this issue, and draw from it conclusions entirely
different from those of the counsel for the relators. We
quote:

"*First.* The condition as it is today in all respects sub-
stantiates and corroborates the testimony of the sailors,
who say that during all the early years, up to about 1870,
at least, in the spring, when the ice had carried away the
rushes, there was nothing to mark the channels.

"*Second.* It also appears from this survey and level
that the major part of these so-called lands are today
under water, and under water that is not stagnant, dead
water, not what is known as swamp water, but the clear
blue waters of the Great Lakes.

"If the lines were actually run to embrace simply
those portions of land which are today above water,
there would be no such looking map as Bartholomew pro-
duced by running the lines out in water six feet deep.

"It is the contention of respondent that the soil or sand
bars that appear above the surface of the water are simply
such as would naturally occur from the action of the
winds and waves upon any bottom of shallow water, and

particularly that the movement of ice in the winter would shove one portion of sand covered with decayed rushes out of the water one year, and a different wind shoving vast ice fields another way across these shallow waters would remove the bar or place to somewhere else.   We submit that there is nothing on any of these narrow necks of what appears as land on the Bartholomew map which could be relied upon to remain on the map from year to year; that there is no reasonable certainty that a bar which is .2 of a foot out of water last year will remain; that the utmost dignity any of this land attains to is simply that of a very few (the highest ground was .8 of a foot in 1904) inches of sand and decayed rushes; that this is at the mercy of the winds, waves, and ice.   For what other reason has every house builder on the Flats carefully fastened his land down ?   Why has every one built dykes and out piles around his so-called land ?   For two reasons:  *First,* because the land was under water, and it was necessary to fill in to raise it above; *second,* because without protecting piles and fills his land would not stay on the map."

Again, we quote:

"The land has gained upon the water of this area since 1850, and its present appearance does not indicate the appearance of 1850.   Five different methods are alleged in Prof. Lane's geological report by which the land surface of the delta gains on the water:  *First,* deposit of material brought down in times of roily water; *second,* the growth of rushes which tends to strain and filter out the drift wood from the débris; *third,* rapid growth of rushes and their decay, receiving as they do in that locality a large share of air and sunshine; *fourth,* the tilting of the land area of the Great Lakes' basins in the direction north 27 degrees east; *fifth,* the cutting down of the outlet of the Detroit river and consequent lowering of Lake St. Clair."

They argue that not only does the testimony show most of the land desired by the relators is now lake bottom, but that it is shown quite conclusively that all of it was submerged land in 1850.

We cannot and shall not attempt to quote any considerable part of the testimony.   Charles Stewart, a witness

produced on behalf of the defendant, testified, in part, as follows:

" *Q.* Where do you reside?

"*A.* Algonac.

" *Q.* How long have you lived at Algonac?

"*A.* Seventy years?

" *Q.* What is your age now?

"*A.* Seventy-four in June.

" *Q.* You were a child then when you came to Algonac?

"*A.* I was only three years old, between three and four.

" *Q.* Have you resided continuously there?

"*A.* Within two miles of the village; I never was farther away to live than that.

" *Q.* What has been your business, generally, during your life; just in a general way what has been your occupation?

"*A.* Well, I farmed a little and hunted a little and worked out by the day and month and year, and for the last part of my life I have been keeping store.

" *Q.* A merchant?

"*A.* Yes, sir.

" *Q.* Do you know the territory known as the 'St. Clair Flats?'

"*A.* Yes, sir.

" *Q.* How long have you known and been familiar with the St. Clair Flats and the river and lake of the same name?

"*A.* Ever since I was about 15 years old; big enough to hunt.

" *Q.* You remember the commencement of the building of the United States ship canal at the Flats?

"*A.* Yes, sir; I don't know as I could tell you just the year.

" *Q.* No, but you remember the circumstance?

"*A.* Yes, sir.

" *Q.* Do you remember the commencement of the building of what is known as the 'Old Club property?'

"*A.* Yes, sir.

" *Q.* Which was first, the canal or the building of the club house?

"*A.* Well, sir, I don't know as I could tell you which was first; there wasn't a great difference between them.

' *Q.* Do you remember the time when the main ship

channel was what is known as the north channel, on the Flats?

"*A.* Yes, sir.

" *Q.* State whether the south channel was used afterwards, instead of the north channel, as the main ship channel?

"*A.* After they got that dredge cut put through, our larger sized boats had to come through the north channel until they did cut that dredge through.

" *Q.* How extensively was the south channel dredged?

"*A.* Well, I don't know that I could tell you exactly.

" *Q.* Was it dredged before the building of the canal?

"*A.* Oh, yes.

" *Q.* Do you know where they threw the earth that they dredged?

"*A.* When they dredged the canal?

" *Q.* When they dredged the south channel?

"*A.* They took it off towards Chatham. They were supposed to take it off about a mile or three-quarters of a mile.

" *Q.* On the Canadian side?

"*A.* On the Canadian side. I have seen the dredges dumping there.

" *Q.* You remember then the St. Clair Flats as early as the year 1850; that would be 54 years ago?

"*A.* Oh, yes.

" *Q.* And prior to that time?

"*A.* And even back of that time.

" *Q.* Well, in the early days, say along about the fifties, I wish to call your attention to the condition of affairs on the Flats at that time, or about that time.

"*A.* In 1850, they ran the old channel; on the north side there.

" *Q.* But I want you to think back to about that period of time, 1850. Are you familiar with the locality on the south channel known as 'Joe Bedore's Hotel?'

"*A.* Yes, and a long while before it was ever built there too.

" *Q.* You remember the location a long while before it was built?

"*A.* Yes, sir.

" *Q.* State whether in 1850, or about that time, there was any channel near the vicinity of Joe Bedore's Hotel that ran from what we now call the south channel to Muscamoot Bay?

"*A.* I should think about—well, I don't know, of course, I didn't measure it, but quite a little channel ran from Muscamoot Bay, and the current ran out •of the south channel over into the bay.

" *Q.* Do you recollect how deep that channel was ?

"*A.* No, I don't know that I do. I don't know but there was some places in it there was eight to ten feet of water. It looked kind of blue I know coming by there on boats, and I have been down there hunting across there, but I never measured it.

" *Q.* Have you an idea about how wide it was ?

"*A.* Well, it wasn't very wide.

" *Q.* Is that channel there now, the old channel ?

"*A.* I think it is; there is a watercourse through there now; I am sure there is.

" *Q.* Through that same channel ?

"*A.* Yes, sir.

"*Q.* From Joe Bedore's, running down the south channel towards where the Old Club now is, what was the general appearance of the westward side of the south channel as to land and water ?

"*A.* Well, I have never seen any land below Joe Bedore's to amount to anything. There may be sometimes a little place sticking up; but it was all of those black rushes, and that signifies water, and lots of it, and I never saw any dry land, never in my life saw any dry land, where the Old Club is, always there was the sea sweeping right across there.

"*Q.* But I am speaking of from Joe Bedore's down to the Club, that condition ?

"*A.* Well, there is no difference down from Joe Bedore's to the Old Club; it is almost a lake; they call that Muscamoot Bay over in there; at the same time the sea came across from the westward to the south channel, and it was hard for us to find the south channel when it was blowing hard or anything like that. Sometimes I used to run to Detroit with a sail boat in the spring of the year when the grass was all down, and the water came right across there, and it was hard work to find any channel, only I went by the blue water, it would show us where the main channel was.

"*Q.* How many years did it continue in that condition, from the time you first knew it ?

"*A.* Well, I seen four high waters in my lifetime since I lived in Algonac, and, of course, the high water comes

up, but the last six or seven or eight years it would be down on the level where it ought to be again.

"*Q.* From the time you first knew that country there, how long did that condition of things continue that you mention; that is, from Joe Bedore's down to where the Old Club is now was practically all water? For how many years was it practically all water?

"*A.* Well, there would be spaces you know of real low water in the river. I couldn't tell just exactly how long them spaces would be apart, but it has always looked to me like a lake. I have passed up and down on the boats for the last 50 years, and it always looked to me like just merely a lake and a streak of rushes growing through there because it was a little shallow there by Muscamoot Bay.

" *Q.* Was it in that condition until they commenced dredging and building artificially in that vicinity?

"*A.* I don't think there was a house built there, but what they had to make all the land they built it on.

" *Q.* How many natural channels can you recall of water that are there now from Joe Bedore's down to the Old Club?

"*A.* I don't know that I know just exactly how many there is. I know there are several.

" *Q.* Do you recall one about three-quarters of a mile above the Old Club? Do you recall one near the Star Island House?

"*A.* Yes, sir.

" *Q.* How wide a channel was that?

"*A.* Probably 50 or 60 feet, maybe more.

" *Q.* Is that channel there now?

"*A.* I think it is, yes.

" *Q.* I am speaking of natural channels, not artificial.

"*A.* Yes, I know.

" *Q.* Do you recall a natural channel also below the Star Island House, nearer to the Old Club, somewhere near what they call the Sampson place, I think?

"*A.* Well, that would be above the Sampson place.

"*Q.* Well, where do you recall any other natural channels aside from the one at Joe Bedore's and near the Star Island House? Where was there any other one?

"*A.* Well, there is that wide one in there. I don't know as I could nearly locate it so as to explain it to you where it is. There is one a great deal wider than the rest.

"*Q*. How wide is that?

"*A*. I should think it is 150 feet."

Counsel say this witness is discredited, but there are several other witnesses who testify substantially along the same lines. Mr. Molitor in his testimony developed the fact that the map of 1867 showed a great many channels of open water of several feet in depth that are shown upon the Bartholomew map as land. We quote a little from his testimony:

"*Q*. At that time that part of Muscamoot Bay had direct and open connection with the south channel?

"*A*. Yes, sir.

"*Q*. About how much?

"*A*. 600 feet—no, it is more than 600 feet; there is 500, about 1,500 feet.

"*Q*. About how would the amount of rushes, marshy land, compare with the quantity of open channels where the water was setting in the current from Muscamoot Bay from this 1,500 feet of open water compare with it there clear down to the ship canal, whether there would be about as much of one as the other?

"*A*. There is, as a general rule, all along it has a little more land frontage, and the channel separating those islands are narrower; they are probably some of them 100 feet or 200 feet or 300 feet wide and some only 50 feet wide.

"*Q*. Those are all natural channels?

"*A*. Yes, there was no dredging done at that time by private parties.

"*Q*. The water in Muscamoot Bay at that time, according to this map, extended clear up to near the timber land to Harsen's Island, the private claims?

"*A*. Yes, sir."

It may properly be said, in this connection, that, prior to the Bartholomew map, none of the surveys were made for the purpose of determining with accuracy the area or character of the land. They were made in the interest of navigation; the primary purpose being to show where the navigable water was to be found and the depth thereof. In the testimony given by Mr. Morley, whose familiarity with the premises is of late date, the following occurred:

"*Q.* From your observation of the territory along the south and middle and Sny Bora channels, could it be made agricultural land by means of levees or draining?

"*A.* No, sir.

"*Q.* Why not?

"*A.* Too low.

"*Q.* Well, if drains were dug, what would be the effect?

"*A.* They would fill in with water.

"*Q.* Could levees be built along these shores?

"*A.* Yes.

"*Q.* It is practicable?

"*A.* No, sir.

"*Q.* In what way could you make any of these so-called lands, as designated on your map, valuable for agricultural purposes?

"*A.* By raising it and elevating it above the water.

"*Q.* And what method could be pursued in doing that?

"*A.* Dredging and filling.

"*Q.* Well, state whether the land would have to be protected in any way from the movement of the water or winds, or from ice, or the washing of steamers, as they passed up and down these channels?

"*A.* They would.

"*Q.* In what way could they be protected if raised?

"*A.* The usual method is to sheet pile the raised ground."

The record discloses beyond any reasonable question that the improvements now existing at the Flats were made in the manner thus explained, except where the buildings were erected upon spiles driven into the soil. Some of the photographs show buildings thus erected completely surrounded by water.

Justice HOOKER, in *People* v. *Warner*, 116 Mich. 228, among other things, said:

"The most comprehensive claim of title on the part of the defendant Warner is that his purchase of Maisou Island gave him title of all land and water to the center of the main channel between the Middle Ground and the east shore of the bay. This would include the Wet Marsh and all of the Middle Ground. We have already intimated that the rule by which such a result is reached does not apply to the Great Lakes. The title to the fee in

the submerged land belongs to the State. *People* v. *Silberwood*, 110 Mich. 103 (32 L. R. A. 694).

"The depth of water upon submerged land is not important in determining the ownership. If the absence of tides upon the Lakes, or their trifling effect, if they can be said to exist, practically makes high and low water mark identical for the purpose of determining boundaries (a point we do not pass upon), the limit of private ownership is thereby marked. The adjoining proprietor's fee stops there, and there that of the State begins, whether the water be deep or shallow, and although it be grown up to aquatic plants, and although it be unfit for navigation. The right of navigation is not the only interest that the public, as contradistinguished from the State, has in these waters. It has also the right to pursue and take fish and wild fowl, which abound in such places; and the act cited has attempted to extend this right over the lands belonging to the State adjoining that portion of the water known to be adapted to their sustenance and increase."

In the case of *Illinois Cent. R. Co.* v. *Illinois*, 146 U. S. 387, Justice Field said:

"It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the States.  *  *  *

"The same doctrine is in this country held to be applicable to lands covered by fresh water in the Great Lakes, over which is conducted an extended commerce with different States and foreign nations. These lakes possess all the general characteristics of open seas, except in the freshness of their waters, and in the absence of the ebb and flow of the tide. In other respects they are inland seas, and there is no reason or principle for the assertion of dominion and sovereignty over and ownership by the State of lands covered by tide waters that is not equally applicable to its ownership of and dominion and sover-

eignty over lands covered by the fresh water of these lakes.   *   *   *

"The Great Lakes are not in any appreciable respect affected by the tide, and yet on their waters a large commerce is carried on, exceeding in many instances the entire commerce of the States on the borders of the sea. *   *   *   By the common law, the doctrine of the dominion over and ownership by the crown of lands within the realm under tide waters is not founded upon the existence of the tide over the lands, but upon the fact that the waters are navigable; 'tide waters' and 'navigable waters' being used as synonymous terms in England. The public being interested in the use of such waters, the possession of private individuals of lands under them could not be permitted except by license of the crown, which could alone exercise such dominion over these waters as would insure freedom in their use so far as consistent with the public interest.   The doctrine is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment, a reason as applicable to navigable fresh waters as to waters moved by the tide.   We hold, therefore, that the same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the Great Lakes applies, which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea, and that the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations."

Cited with approval in *People* v. *Silberwood,* 110 Mich. 107 (32 L. R. A. 694). See, also, the discussion and authorities cited in the opinion of Justice HOOKER in *State* v. *Lake St. Clair Fishing & Shooting Club,* 127 Mich. 580.

Construing the evidence in this case in the light of these legal rules, can it be said the relators have clearly shown the land in controversy to have been swamp or overflowed lands in 1850 ?   It is a familiar rule of law that the writ of mandamus will not issue until the applicant for it has shown a clear legal right to it.   *County of Houghton* v. *Auditor General,* 36 Mich. 271; *People, ex rel. McCar-*

*thy*, v. *Monroe Circuit Judge*, 36 Mich. 274.   In *People, ex rel. Pack*, v. *Supervisors of Presque Isle County*, 36 Mich. 380, it was said: "A mandamus will not issue to enforce any doubtful right." See, also, *Loomis* v. *Township Board of Rogers*, 53 Mich. 135; *Post* v. *Township Board of Sparta*, 63 Mich. 323; *McLaughlin* v. *Burroughs*, 90 Mich. 311; *Van Akin* v. *Dunn*, 117 Mich. 421. While the testimony in this case is contradictory, we think the relators have not clearly made it to appear that in 1850 the land was swamp or overflowed land; but, on the contrary, we think the preponderance of the testimony is to the effect that the land in 1850 was submerged lake bottom.

Having reached this conclusion, it is unnecessary to discuss the many other interesting questions raised by the learned counsel.

The writ is denied.

MONTGOMERY, J. (*concurring*).   The history of these proceedings is correctly set forth in the opinion of Mr. Justice MOORE. I agree with Mr. Justice MOORE that the State is in no way estopped from asserting that the lands involved in these proceedings are not swamp and overflowed lands, within the meaning of the Federal grant of 1850, and that it is open to the State to assert that the so-called lands are in fact, and were at the time of the admission of the State into the Union, a part of the bed of the lake. If they were in fact a part of the bed of the lake, the title to the fee passed to the State by virtue of the admission of the State into the Union, and the Federal government had nothing to grant in 1850. *People* v. *Silberwood*, 110 Mich. 103 (32 L. R. A. 694).

In the case of *State* v. *Lake St. Clair Fishing & Shooting Club*, 127 Mich. 580, we were called upon to determine whether certain lands in the vicinity of those here claimed were swamp lands, or were a part of the bed of the lake. In that case, however, we were dealing with a finding of facts by the circuit judge, and we held upon

the finding made by the circuit judge that the lands in question should be considered swamp and overflowed within the meaning of the swamp-land act. We were only permitted under the rules of law to look into the evidence for the single purpose of ascertaining whether there was any evidence tending to support the finding of the circuit judge. This we found; and, under well-recognized rules, were required to affirm that finding, and the result followed that those lands were adjudged to be swamp lands.

In the present case, the whole record is open for examination, and a careful examination of the testimony satisfies us that the preponderance of evidence is in favor of the respondent's contention that these lands were at the time of the admission of the State into the Union submerged lands and a part of the bed of the lake. Any attempt to set out the testimony at length in this opinion would extend it beyond any reasonable limit. One point may be adverted to. The evidence discloses that the depth of water at the place in question and in the Great Lakes varies from year to year. In the brief of relator's counsel, it is claimed that the evidence showed that the mean level in 1850 at the time of the passage of the swamp-land act was 574.842, which was somewhat lower than from 1853 on, the period to which the estimony of respondent's witnesses is chiefly directed, and that for this reason the testimony of these witnesses showing that these so-called lands were a part of the bed of the lake should be discounted. But a sufficient answer to this contention is that the title to these lands as a part of the bed of the lake passed to the State, if at all, in 1837, and at this date, according to relator's claim, the mean level was 576.375, and according to respondent's claim was 576.84, or a depth of more than 1 foot greater than in 1893, and nearly 1 foot greater than in 1894, and 2 feet greater than in 1901. So that, if we assume that there was a short period during which the lands had more the appearance of swamp than either before or since that period, the

title had vested in the State by virtue of the admission of the State into the Union in 1837.

I concur in the order denying the writ.

McALVAY, C. J., and OSTRANDER, and MOORE, JJ., concurred with MONTGOMERY, J.

HOOKER, J. (*concurring*). I concur in the result reached by my associates. I am unwilling, however, to assent to the possible implication that the Federal swamp-land act applies to any lands within the meander lines of the Great Lakes, except as indicated in the writer's opinions in the cases of *Brown* v. *Parker*, 127 Mich. 390, *Olds* v. *Commissioner of State Land Office*, 134 Mich. 449, and *State* v. *Lake St. Clair Fishing & Shooting Club*, 127 Mich. 601.